**LA CIENEGA MUSIC COMPANY,**
Plaintiff–Appellant,

v.

**ZZ TOP; Billy Gibbons; Joe Michael Hill, pka: Dusty Hill; Frank Beard; Bill Ham, dba: Hamstein Music Company and Lone Wolf Production Company; Glad Music Company; Warner Brothers Records, Incorporated; WEA International, Inc.; Broadcast Music, Inc., Defendants–Appellees.**

No. 93–55230.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 10, 1994.

Decided Jan. 10, 1995.

Alan G. Dowling, Shapiro, Posell, Rosenfeld & Close, Los Angeles, CA, for plaintiff-appellant.

Joseph D. Schleimer, Lavely & Singer, Los Angeles, CA, for defendants-appellees.

---

■■■■■■■■■■■

Before: PREGERSON, O'SCANNLAIN, and FERNANDEZ, Circuit Judges.

Opinion by Judge O'SCANNLAIN; Partial Concurrence and Partial Dissent by Judge FERNANDEZ.

O'SCANNLAIN, Circuit Judge:

We must decide whether the sale of an unregistered recording constitutes "publication" for copyright purposes.

## I

In its copyright infringement suit against the Texas blues-rock band "ZZ Top" and others, La Cienega Music Company ("La Cienega") accuses them of plagiarism in the composition of the song "La Grange"—which the band wrote and recorded over twenty years ago. The song, which is ZZ Top's signature song, has had global circulation as a phonorecord, has been recorded by other prominent artists, has been prominently featured in a national television advertising campaign, and has been performed at thousands of ZZ Top concerts.

In 1948, John Lee Hooker and Bernard Besman wrote a musical composition called *Boogie Chillen.* A recording of the song was sold to the public later that year and eventually up to one million copies were sold. Later, Hooker assigned his rights in the composition to Besman, who now is the sole proprietor of La Cienega. Besman registered *Boogie Chillen* with the Copyright Office in 1967.

Hooker and Besman wrote a second version of *Boogie Chillen* in 1950. Besman eventually received full ownership rights in this second composition and registered it in 1970.

In 1970, Hooker recorded an album called "Canned Heat," on which a third version of *Boogie Chillen* appeared. La Cienega authorized this version, which Besman later registered with the Copyright Office in 1992.

In 1973, ZZ Top released an album containing a song called *La Grange.* ZZ Top acknowledges that this song has had global circulation as a phonorecord, has been featured in prominent national television advertising, and has been performed at thousands of ZZ Top concerts.

Hooker allegedly alerted Besman to the existence of *La Grange* in 1991. Besman states that, upon investigation, he realized that *La Grange* was very similar to the *Boogie Chillen* songs. Besman then notified the publisher of *La Grange,* Hamstein Music Company, that it was infringing upon his copyright. Hamstein subsequently filed a declaratory judgment action in Texas to resolve the dispute. Besman, in turn, filed this suit in the Central District of California on behalf of La Cienega against the appellees ("ZZ Top").

ZZ Top filed a rule 12(b)(6) motion asserting that (1) the compositions were within the public domain, and therefore were not protected by copyright, and (2) even if the compositions had been protected at the time that ZZ Top released *La Grange,* La Cienega's action was barred by a statute of limitations. The district court dismissed the complaint, ruling that the recordings were in the public domain. The district court expressly declined to determine whether the statute of limitations had expired.

La Cienega timely appeals the district court's dismissal.

## II

■ Under the Copyright Act of 1909,[1] a properly recorded artistic work receives copyright protection for "twenty eight years from the date of first publication," and the author may renew the copyright term for an additional 28–year period. Copyright Act of 1909, ch. 320, § 23, 35 Stat. 1075, 1080. Under the 1909 Act, an unpublished work was protected by state common law copyright from the moment of its creation until it was either published or until it received protection under the federal copyright scheme.

1. The 1909 Copyright Act governed rights in musical compositions until January 1, 1978, when the 1976 Copyright Act took effect. Both parties agree that the 1909 Act is the relevant statute for this action.

*Roy Export Co. Establishment of Vaduz v. CBS, Inc.*, 672 F.2d 1095, 1101 (2d Cir.), *cert. denied*, 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982). When a work was published, it lost state common law protection. The owner could, however, obtain federal protection for the published work by complying with the requirements of the 1909 Act. *Id.* If the owner failed to satisfy the Act's requirements, the published work was injected irrevocably into the public domain. *Id.; see also 1 Nimmer on Copyright* §§ 7.01, 7.02[C][1].

The parties dispute when the various versions of *Boogie Chillen* were published within the meaning of the 1909 Act. According to ZZ Top, La Cienega published these recordings when it released them to the general public (*i.e.*, 1948, 1950, and 1970). La Cienega counters that publication did not occur until it filed a notice of copyright with the Copyright Office in 1967, 1970, and 1992, respectively. Until that time, it claims, the recordings were "unpublished" and, therefore, retained their state common law copyright protection. Congress declined to define "publication" in the 1909 Act and courts have split over how to define the term for copyright purposes.

The majority of district courts considering this question have adopted ZZ Top's view. 1 *Nimmer on Copyright* (1992) § 4.05[B], at 4–26. The only appellate court to rule on the issue, however, has favored the approach proffered by La Cienega. In *Rosette v. Rainbo Record Mfg. Corp.*, 354 F.Supp. 1183 (S.D.N.Y.1973), *aff'd per curiam*, 546 F.2d 461 (2d Cir.1976), the Second Circuit adopted the lower court's opinion that the sale of phonograph records does not constitute "publication" under the 1909 Act.

We decline to follow *Rosette*. First, *Rosette* is the minority rule; our research fails to reveal any other circuit which has followed it. The majority rule, as noted by the district court, has been articulated by Nimmer:

> The courts in applying the 1909 Act, were in most instances unpersuaded by the argument that no publication occurs by virtue of the sale of a phonorecord because the record is not a "copy" of the work recorded. On the contrary, the relatively few courts which considered the question were almost unanimous in determining that *public sale or other distribution of phonorecords does constitute a publication and hence a divestment of common law rights in the works recorded.* This conclusion is certainly consistent with the common understanding of the term "copy." Moreover, it is in accord with the underlying rationale of the publication doctrine. That is, an author in permitting records of his work to be publicly marketed is certainly engaging in a form of exploitation of his work and should therefore be required to seek protection, if at all, only under the limited monopoly concept of the federal Copyright Act.

1 *Nimmer on Copyright* (1992) § 4.05[B], at 4–26 (citations omitted) (emphasis added).

Although La Cienega argues that Nimmer is incorrect in calling *Rosette* the minority rule, even the same court which originally decided that case has noted "that *Rosette* is not without its critics and is not followed by a majority of district courts in other circuits." *Jones*, 643 F.Supp. at 1158.

Second, *Rosette* reduces the incentive to immediate compliance with the 1909 Act. According to the statutory scheme, an artist who composes a song, wants to sell recordings immediately, and thus copyrights the song in compliance with the 1909 Act, has 28 years of copyright protection from the time of compliance. In contrast, under *Rosette*, an artist who does not so comply can sell any number of recordings for several years, receiving common law copyright protection all the while, before copyrighting the work with the Copyright Office. From the point of this late compliance on, the statutory copyright owner receives 28 years of federal protection. *Rosette*, 354 F.Supp. at 1193. *Rosette* consequently may encourage artists to delay compliance with the Copyright Act's requirements and thereby receive "longer" copyright protection. Such an outcome would clearly be undesirable.

We adopt the majority rule and hold that selling recordings constitutes "publication" under the Copyright Act of 1909. Conse-

quently, the compositions were published in 1948, 1950, and 1970, respectively.

## III

■ Given that the compositions were published when recordings were sold to the public, we must next decide when the compositions entered the public domain. The answer turns on whether Besman complied with the copyright requirements of the 1909 Act. Under section 9 of the Act,

> Any person entitled thereto by [the 1909 Act] may secure copyright for his work by publication thereof with the notice of copyright required by this title; and such notice shall be affixed to each copy thereof published or offered for sale in the United States....

Copyright Act of 1909, ch. 320, § 9, 35 Stat. 1075, 1077. If Besman failed to satisfy these requirements, his compositions entered the public domain immediately upon the sale of recordings to the public. *See 1 Nimmer on Copyright* §§ 7.01, 7.02[C][1].

The record fails to reveal whether Besman complied with the copyright requirements of the 1909 Act. This omission is not decisive in the case of the 1948 and 1950 versions of *Boogie Chillen,* however. Failure to renew a copyright after 28 years irrevocably injects the work at issue into the public domain. Copyright Act of 1909, ch. 320, § 23, 35 Stat. 1075, 1080. Thus, even if Besman complied with the requirements of the 1909 Act, his compositions entered the public domain in 1976 and 1978 respectively, when the statutory copyrights expired without renewal.

■ Besman's compliance or lack thereof affects the resolution of his claim with respect to the 1970 version of *Boogie Chillen,* however. If Besman complied with the statutory requirements, then his composition was copyrighted at the time of publication in 1970. If Besman failed to comply with such requirements, the 1970 version of *Boogie Chillen* was irrevocably injected into the public domain upon publication in 1970, and Besman would not be entitled to recover for the claimed infringements. To resolve this matter, we must remand to the district court for further findings.[2]

## IV

La Cienega also appeals the district court's denial of leave to amend after a responsive pleading had been filed. In its opposition to the motion to dismiss, La Cienega asked to be allowed to substitute "recorded" for "published" in its complaint. Even with such substitution, however, the complaint would not survive a rule 12(b)(6) motion. The compositions were "published," not because of the complaint's language, but because recordings were sold to the public. Because the substitution of words would not have changed the substance of the complaint, the district court did not abuse its discretion in denying leave to amend.

AFFIRMED in part, REVERSED and REMANDED in part.

FERNANDEZ, Circuit Judge, concurring and dissenting:

I agree with Parts I and with much of Parts III and IV of the opinion. I do not, however, agree with Part II nor, of course, with the conclusions in Parts III and IV which are influenced by the majority's conclusion in Part II.

My difficulty with Part II is with its construction and rejection of *Rosette v. Rainbo Record Mfg. Corp.,* 354 F.Supp. 1183 (S.D.N.Y.1973), *affirmed,* 546 F.2d 461 (2d Cir.1976), and with its concomitant explication of copyright law.

While *Rosette* may present some difficulty, it does grapple with the conundrum posed by *White–Smith. See White–Smith Music Pub. Co. v. Apollo Co.,* 209 U.S. 1, 17–18, 28 S.Ct. 319, 323, 52 L.Ed. 655 (1908). If a record (or piano roll) is not a copy of the underlying

---

2. We remind the district court that under § 209 of the 1909 Act, a valid certificate of registration creates a rebuttable presumption of compliance with the statutory requirements. *See Rohauer v. Friedman,* 306 F.2d 933, 935 (1962); *see also Gaste v. Kaiserman,* 863 F.2d 1061, 1065 (2d Cir.1988); *Transgo, Inc. v. Ajac Transmission Parts Corp.,* 768 F.2d 1001, 1019 (9th Cir.1985), *cert. denied,* 474 U.S. 1059, 106 S.Ct. 802, 88 L.Ed.2d 778 (1986) (registration by Copyright Office constitutes prima facie evidence of copyrightability).

work, how can it result in publication of that work? *See Corcoran v. Montgomery Ward & Co., Inc.* 121 F.2d 572, 573–74 (9th Cir.) (records treated like piano rolls), *cert. denied*, 314 U.S. 687, 62 S.Ct. 300, 86 L.Ed. 550 (1941). *Rosette* held that because a record is not a copy, it is not a publication. 354 F.Supp. at 1191–92.[1]

In that, I think *Rosette* was quite logical, indeed correct.[2] I think it takes some very fancy footwork to duck *White–Smith* and, thus, convert a recorded performance into a publication of the underlying work. Like *Rosette*, I do not believe it can be done. If that is true, I, like *Rosette*, must confront the argument that it might appear that a common law copyright holder has greater rights than a person who has actually registered his copyright under the 1909 Act. *Rosette* avoided that difficulty by deciding that the actual protective part of copyright—the right to recover for another's use of recordings of the musical work—would have to await the registration of the work, as contemplated by 17 U.S.C. § 1(e) (1909). Thus, the author of the copyrighted work really could not obtain any greater protection than that available to the author of a registered work.

Of course, *Rosette* did not directly speak to the length of protection under the 1909 Act, once an author actually did register. That is a problem which confronts us and which causes the majority to eschew the *Rosette* analysis. But it seems to me that the reasoning process which drove *Rosette* supplies the answer to the length issue as well. That is, the author cannot recover the § 1(e) royalty beyond the time that an author could have recovered it had the author registered the work when he first released a recorded performance of it. Thus, the author who does not register in a timely fashion cannot artfully extend the time during which he can

exploit his work. No doubt, had the author actually published the musical work—as opposed to releasing a recording of its performance—the issue would be a different one, but we need not deal with that issue in this case.

I do not think that either *Rosette* or my gloss upon it makes a tidy package. I do, however, think that it is the proper way to make *White–Smith* and the 1909 Act compatible. No other view seems better to me. If a record is not a copy, then placing a copyright notice upon the record itself would do no good at all because the notice is to be affixed to "each copy." 17 U.S.C. § 9 (1909) (In 1947 this became § 10.) Thus, under the majority's view the result is that a record *is* a publication for the purpose of divesting the author's copyright protection in the underlying musical work, but it would not be a publication for the purpose of investing that musical work with protection. The fact is that Congress devised a scheme to protect authors by allowing them to collect royalties from others who did not copy the author's musical work when they made records. That should not be taken as an intent by Congress to divest authors of protection for their own musical works when they issue records, which, perforce, are not copies of the musical work either. At least the untidy package I suggest protects authors, and I see no reason to accept the untidy package wrapped by the majority, which protects those who would poach on the author's creativity.

For the reasons outlined by the majority, the difference between my approach and that of the majority makes no difference in the result regarding the recorded 1948 and 1950 versions of *Boogie Chillun*. Moreover, there will be no difference as to the 1970 version if a copyright under the 1909 Act was otherwise secured when that version was released.

**1.** As *Rosette* indicated, *both* the fact that the United States became a party to the Universal Copyright Convention, which adopted the view that a recording is not a publication, *and* the fact that Congress could have, but did not, abolish *White–Smith* when it created the 1909 Act buttressed the no-publication conclusion. *Id.* at 1189, 1191–92.

**2.** It seems to me that *Rosette's* reasoning was preferable to the *ipse dixits* of a number of other

courts that opined, without explaining the reason, that the publication of the record (a non-copy of the underlying work) still managed to publish the underlying work itself. *See, e.g., McIntyre v. Double–A Music Corp.*, 166 F.Supp. 681, 682–83 (S.D.Cal.1958); *Mills Music, Inc. v. Cromwell Music, Inc.*, 126 F.Supp. 54, 69–70 (S.D.N.Y.1954); *Shapiro, Bernstein & Co., Inc. v. Miracle Record Co., Inc.*, 91 F.Supp. 473, 474 (N.D.Ill.1950).

However, our difference could affect the result if no steps were taken to obtain a copyright under the 1909 Act at or before the time that the recorded 1970 version of *Boogie Chillun* was issued.[3]

Thus, I dissent in part but concur in the remainder of the opinion.

---

**3.** I express no opinion on other issues or defenses that might affect the decision in this case.