Aubrey MAYHEW, d/b/a Mayhew
Music Co., et al.,

v.

GUSTO RECORDS, INC., et al.

Aubrey MAYHEW, et al.

v.

Steven A. HAWKINS, et al.

Nos. 3:94–0134, 3:94–0233.

United States District Court,
M.D. Tennessee,
Nashville Division.

April 4, 1997.

John Aaron Holt, Nashville, TN, for Plaintiff.

Jay Scott Bowen, Nashville, TN, for Defendant.

## MEMORANDUM

CAMPBELL, District Judge.

Pending before the Court is Defendants' Motion For Partial Summary Judgment (Docket No. 22). The Court heard oral argument on the Motion on March 17, 1997. For the reasons described herein, the Motion is GRANTED.

### I. Issues

This case presents two fundamental issues under the 1909 Copyright Act.

The first issue is whether the public distribution of a phonorecord without a copyright notice places the underlying musical composition into the public domain. The Court holds, based on the record in this case, that the works at issue are in the public domain.

The second issue is whether an application for copyright renewal that is filed with the Copyright Office before the one year period immediately prior to the expiration of the original copyright renews the copyright. The Court holds, based on the record in this case, that the copyrights in dispute were not renewed and that the works are in the public domain.

### II. Facts

Plaintiffs have filed a Complaint for copyright infringement of forty-two musical compositions.[1] 17 U.S.C. § 101, et seq. The

---

1. The Complaint contains other claims not relevant to the pending Motion for Partial Summary Judgment that were dismissed by Order (Docket

pending Motion seeks a ruling on six of these musical compositions that the Defendants believe are representative of certain legal issues common to all forty-two works.

The parties, at oral argument, agreed that there are no genuine issues as to any material facts. The parties further agreed that the 1909 Copyright Act applies to this case. The Court has subject matter jurisdiction. 28 U.S.C. § 1331.

Defendants claim that four of the musical compositions are in the public domain because Plaintiffs published the works by distributing phonorecords that did not contain a copyright notice. The four works are: "All-American Boy," "Apartment No. # 9," "Don't Monkey With Another Monkey's Monkey," and "How Fast Them Trucks Can Go." [2] Plaintiffs do not dispute the fact that the phonorecords were sold to the public without copyright notices. Plaintiffs, however, dispute the legal significance of the absent copyright notices.

Defendants assert that the two remaining works are in the public domain because the relevant application for copyright renewal was filed prematurely with the Copyright Office. The musical compositions are: "Sunnyside of the Mountain" and "Patanio, Pride of the Plain." [3] Plaintiffs do not dispute the fact that the copyright renewal application for these works was filed three days before the one year period immediately prior to the expiration of the original copyright.[4] Plaintiffs, nevertheless, contest the legal effect of this fact.

### III. Summary Judgment Standard

As provided in Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a

No. 11) entered on August 30, 1995 by another District Judge.

**2.** The copyright of the musical composition "The All–American Boy" was claimed by registration with the Copyright Office on November 13, 1958. On December 22, 1958, "The All–American Boy" debuted in Billboard Magazine.

The copyright of the musical composition "Apartment # 9" was claimed by registration with the Copyright Office on April 27, 1967. "Apartment # 9" debuted in Billboard Magazine on October 8, 1966.

On December 8, 1967, the copyright in the musical composition "Don't Monkey With Another Monkey's Monkey" was claimed by registration with the Copyright Office. A recording of this musical composition debuted in Billboard Magazine on December 23, 1967.

The copyright in the musical composition "How Fast Them Trucks Can Go" was claimed by registration with the Copyright Office on October 25, 1984. The actual date of creation was 1964. A recording of the composition achieved a peak position of Number 12 on the Billboard Country Charts for the week of September 23, 1967.

**3.** On January 29, 1946, the copyright of the musical compositions contained in "Big Slim. The Lone Cowboy's Folio" was claimed by registration with the Copyright Office. "Sunnyside of the Mountain" and "Patanio, Pride of the Plain" are contained in the Folio.

**4.** The original copyright registration for both "Sunnyside of the Mountain" and "Patanio, Pride of the Plain" was filed with the Copyright Office on January 29, 1946. The Certificate of Copyright Registration, E pub 918 (Docket No. 24, Ex. 22), provides: "Date of publication in the United States Jan. 24, 1946." The Certificate of Registration of a Claim to Renewal Copyright, R545779 (Docket No. 24, Ex. 24), also provides that the date of publication is "January 24, 1946." The original copyright, thus, expired on January 24, 1974, twenty-eight years after publication. Copyright Act of 1909, Ch. 320, § 23, 35 Stat. 1075, 1080–81. The one year period immediately prior to the expiration of the copyright, therefore, ran from January 25, 1973 to January 24, 1974. The copyright renewal application for both works was filed with the Copyright Office on January 22, 1973, three days before the one year period immediately prior to the expiration of the original copyright.

At oral argument, Defendants stated that the renewal application was eight days premature. Defendants apparently counted from the date the copyright registration was filed (January 29) rather than the date of publication (January 24) as apparently required by Section 24 of the Copyright Act of 1909. ("The Copyright secured by this title shall endure for twenty-eight years from the date of first publication....") In any event, whether the copyright renewal application was filed three days, or eight days, before the one year period immediately prior to expiration of the original copyright does not matter, since the parties agree the renewal application was filed before the relevant period in either event.

matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202, 211 (1986). Of course, the court is to construe the evidence and all inferences to be drawn from it in the light most favorable to the nonmoving party. *Id.* at 255, 106 S.Ct. at 2513–14, 91 L.Ed.2d at 216.

Once a motion for summary judgment has been made, "the non-moving party bears the responsibility to demonstrate that summary judgment is inappropriate under Rule 56(e)." *Davidson & Jones Dev. Co. v. Elmore Dev. Co., Inc.*, 921 F.2d 1343, 1349 (6th Cir.1991). The non-moving party may not merely rest on conclusory allegations contained in the complaint, but must respond with affirmative evidence supporting its claims and establishing the existence of a genuine issue of material fact. *Cloverdale Equip. Co. v. Simon Aerials, Inc.*, 869 F.2d 934, 937 (6th Cir. 1989).

### IV. Copyright Notice Issue

United States copyright law traces its origin to Sixteenth Century England. Copyright was created to serve the dual purposes of government control and special interest monopolization of publishing. By the time the Statute of Anne was enacted in 1710, the focus of copyright had changed to the competing interests of protecting authors and encouraging the dissemination of knowledge. This history became the basis for the Copyright Clause[5] of the Constitution and the enactment of implementing legislation in 1790. R. Gorman, *Copyright Law*, (Federal Judicial Center 1991), at 1–2.

The Copyright Act of 1909 was subsequently enacted into law, and it is this statute that controls the decision in this case:

A principal feature of the 1909 Act was the preservation of state copyright protection (known as common-law copyright) for unpublished works; once a work was published by dissemination to the public, however, either federal copyright formalities were satisfied or the work fell into the public domain. If the familiar copyright notice

was placed on all copies of a published work, federal copyright protection attached, exclusively enforced in federal courts (provided the copyright owner registered the work in the Copyright Office prior to commencing suit). Such federal copyright lasted for twenty-eight years and was subject to renewal upon timely registration for an additional twenty-eight years.

*Id.*

The notice requirements of the 1909 Copyright Act have been changed significantly, and those changes do not apply in this case. The Copyright Act of 1976, and the amendments passed in 1989 regarding notice, are not applicable. Simply put, current law does not require a copyright notice to be displayed on a work as a condition of copyright protection. 17 U.S.C. §§ 401 and 402; *1 Nimmer on Copyright* § 4.05[A], at 4–23(1992).

The Court, therefore, is required to apply a turn-of-the-century law to musical compositions that are subject to high-tech distribution over the World Wide Web if they are in the public domain.

Under the 1909 Copyright Act, an unpublished work is protected by state common law copyright from the time of its creation until it is either published or receives protection under the federal copyright law. When a work is published, it loses its state common law protection. The owner, however, can obtain federal copyright protection for the published work by complying with the formalities of the 1909 Copyright Act. "If the owner failed to satisfy the Act's requirements, the published work was injected irrevocably into the public domain." *La Cienega Music Co. v. ZZ Top*, 53 F.3d 950, 952 (9th Cir.1995). If publication is accompanied by the federal statutory requirements, such as the placement of a proper copyright notice on all copies distributed to the public, federal copyright protection generally applies under the 1909 Copyright Act.

---

5. Article 1, Section 8, of the United States Constitution provides: "The Congress shall have power ... To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries."

Section 9 [6] of the 1909 Copyright Act provides:

> Any person entitled thereto by this Act may *secure copyright for his work by publication thereof with the notice of copyright required by this Act: and such notice shall be affixed to each copy thereof published or offered for sale* in the United States by authority of the copyright proprietor, except in the case of books seeking ad interim protection under section twenty-one of this Act.

Copyright Act of 1909, Ch. 320, § 9, 35 Stat. 1075, 1077 (emphasis added).

Thus, when a work is deemed "published" is crucial for determining whether it is protected by the 1909 Copyright Act. If the work is "published" without a proper copyright notice, it can prove fatal to the copyright.

Unfortunately, "Congress declined to define 'publication' in the 1909 Act and courts have split over how to define the term for copyright purposes." *La Cienega*, 53 F.3d at 952.

This Court, therefore, must determine whether the commercial distribution of phonograph records of the musical compositions at issue constitutes "publication" of the compositions within the meaning of the 1909 Copyright Act.

It appears that the only Courts of Appeal that have addressed the publication issue in reported opinions are the Second Circuit and the Ninth Circuit. This case, therefore, presents itself, in large part, as a choice between following the rule established by the Second Circuit or the rule established by the Ninth Circuit.[7]

In *Rosette v. Rainbo Record Mfg. Corp.*, 354 F.Supp. 1183 (S.D.N.Y.1973), *aff'd per curiam*, 546 F.2d 461 (2d Cir.1976), the Second Circuit adopted the District Court's opinion that the sale of phonograph records does not constitute "publication" under the 1909 Copyright Act. This case concerned certain musical compositions of children's nursery rhymes, such as "Mary Had A Little Lamb," and other original compositions.

The *Rosette* District Court framed the question presented as follows:

> The defendants raise an important issue, however, which has intrigued the law professors: whether the distribution of phonograph records without copyright registration is a publication that results in a loss of the common law copyright in the unpublished composition and is a dedication of the musical composition to the public.
>
> . . . .
>
> The question is whether the mechanical reproduction on a phonograph record of an otherwise unpublished composition itself constitutes publication so as to divest the author of common law rights.

*Rosette v. Rainbo Record Mfg. Corp.*, 354 F.Supp. 1183, 1188 (S.D.N.Y.1973). The *Rosette* District Court then observed that the Supreme Court, in *White–Smith Music Pub. Co. v. Apollo Co.*, 209 U.S. 1, 28 S.Ct. 319, 52 L.Ed. 655 (1908), held that a music roll for mechanical pianos did not constitute a copy of the recorded music. Based on *White–Smith*, the *Rosette* District Court concluded that a phonorecord was not a "copy" of the underlying work. The *Rosette* District Court then held as follows on various grounds: "I hold that the sale of phonograph records is not a divestment of common law rights by publication but that it does inhibit suit

---

**6.** This Section of the 1909 Copyright Act was codified as 17 U.S.C. § 10; *5 Nimmer on Copyright*, App. 6–13(1996).

**7.** *See also McIntyre v. Double–A Music Corp.*, 166 F.Supp. 681 (S.D.Cal.1958); *Shapiro, Bernstein & Co. v. Miracle Record Co.*, 91 F.Supp. 473 (N.D.Ill.1950); *Mills Music v. Cromwell Music*, 126 F.Supp. 54 (S.D.N.Y.1954); *Hemingway's Estate v. Random House, Inc.*, 53 Misc.2d 462, 279 N.Y.S.2d 51 (N.Y.Sup.Ct.1967), *aff'd*, 23 N.Y.2d 341, 296 N.Y.S.2d 771, 244 N.E.2d 250 (1968); *International Tape Mfrs. Ass'n. v. Gerstein*, 344 F.Supp. 38 (S.D.Fla.1972), *vacated for lack of ripeness*, 494 F.2d 25 (5th Cir.1974). *White v. Kimmell*, 193 F.2d 744 (9th Cir.1952), *cert. denied*, 343 U.S. 957, 72 S.Ct. 1052, 96 L.Ed. 1357 (1952); *Continental Cas. Co. v. Beardsley*, 253 F.2d 702 (2d Cir.1958), *cert. denied*, 358 U.S. 816, 79 S.Ct. 25, 3 L.Ed.2d 58 (1958); *Patterson v. Century Productions*, 93 F.2d 489 (2d Cir.1937), *cert. denied*, 303 U.S. 655, 58 S.Ct. 759, 82 L.Ed. 1114 (1938); *Hirshon v. United Artists Corp.*, 243 F.2d 640 (D.C.Cir.1957); *McCarthy & Fischer, Inc. v. White*, 259 F. 364 (S.D.N.Y.1919).

against infringers until the statutory copyright is obtained and the notice of use is filed." 354 F.Supp. at 1193.

The Second Circuit in *Rosette* stated: "The central issue is whether commercial distribution of phonograph records of musical compositions under the circumstances of this case constitute a publication of their scores within the meaning of publication in the law of copyright protection." *Rosette v. Rainbo Record Mfg. Corp.*, 546 F.2d 461, 462 (2d Cir.1976). The Second Circuit then observed that the District Court "concluded that no acts of publication had occurred prior to obtaining the statutory copyrights" and affirmed the District Court. *Id.* at 463.

Thus, under *Rosette*, public distribution of a phonorecord is not "publication" for purposes of the 1909 Copyright Act. The Ninth Circuit holds to the contrary.

In *La Cienega Music Co. v. ZZ Top*, 53 F.3d 950 (9th Cir.1995), the Ninth Circuit expressly refused to follow Rosette. The issue before the *La Cienega* Court was "whether the sale of an unregistered recording constitutes 'publication' for copyright purposes" under the 1909 Copyright Act. *Id.* at 952. The case was an infringement action by the owners of "Boogie Chillen" against ZZ Top for its signature song "La Grange."

The *La Cienega* Court held: "We adopt the majority rule and hold that selling recordings constitutes 'publication' under the Copyright Act of 1909." 53 F.3d at 953. The *La Cienega* Court expressly rejected *Rosette* for the following reasons:

> The majority of district courts considering this question have adopted ZZ Top's view. 1 Nimmer on Copyright (1992) § 4.05[B], at 4–26. The only appellate court to rule on the issue, however, has favored the approach proffered by La Cienega. In *Rosette v. Rainbo Record Mfg., Corp.*, 354 F.Supp. 1183 (S.D.N.Y.1973), *aff'd per curiam*, 546 F.2d 461 (2d Cir.1976), the Second Circuit adopted the lower court's opinion that the sale of phonograph records does not constitute "publication" under the 1909 Act.
>
> We decline to follow *Rosette*. First, *Rosette* is the minority rule; our research fails to reveal any other circuit which has

followed it. The majority rule, as noted by the district court, has been articulated by Nimmer:

> The courts in applying the 1909 Act, were in most instances unpersuaded by the argument that no publication occurs by virtue of the sale of a phonorecord because the record is not a "copy" of the work recorded. On the contrary, the relatively few courts which considered the question were almost unanimous in determining that public sale or other distribution of phonorecords does constitute a publication and hence a divestment of common law rights in the works recorded. This conclusion is certainly consistent with the common understanding of the term "copy." Moreover, it is in accord with the underlying rationale of the publication doctrine. That is, an author in permitting records of his work to be publicly marketed is certainly engaging in a form of exploitation of his work and should therefore be required to seek protection, if at all, only under the limited monopoly concept of the federal Copyright Act.
>
> 1 Nimmer on Copyright (1992) § 4.05[B], at 4–26 (citations omitted) (emphasis added).

. . . .

Second, *Rosette* reduces the incentive to immediate compliance with the 1909 Act. According to the statutory scheme, an artist who composes a song, wants to sell recordings immediately, and thus copyrights the song in compliance with the 1909 Act, has 28 years of copyright protection from the time of compliance. In contrast, under *Rosette*, an artist who does not so comply can sell any number of recordings for several years, receiving common law copyright protection all the while, before copyrighting the work with the Copyright Office. From the point of this late compliance on, the statutory copyright owner receives 28 years of federal protection. *Rosette*, 354 F.Supp. at 1193. *Rosette* consequently may encourage artists to delay compliance with the Copyright Act's requirements and thereby receive "longer"

copyright protection. Such an outcome would clearly be undesirable.

*Id.*

A dissenting opinion in *La Cienega* took the position that *Rosette* was good law: "While *Rosette* may present some difficulties, it does grapple with the conundrum posed by *White–Smith.* (citation omitted). If a record (or piano roll) is not a copy of the underlying work, how can it result in publication of that work? (citation omitted). *Rosette* held that because a record is not a copy, it is not a publication. (citation omitted). In that, I think *Rosette* was quite logical, indeed correct." 53 F.3d at 954–55. It should be noted that *White–Smith* was decided the year before the 1909 Copyright Act was enacted into law.

Thus, under *La Cienega,* public distribution of a phonorecord is "publication" for purposes of the 1909 Copyright Act. *Rosette* holds to the contrary.

All this would be a great academic question in the Sixth Circuit, as noted by the *Rosette* District Court, but for the unpublished case of *Leeds Music Corp., et al. v. Gusto Records, Inc., et al.,* 601 F.2d 589 (Table), No.77–1177 (6th Cir. June 20, 1979). The Sixth Circuit, in its unpublished opinion, held as follows:

> Appellants Leeds Music Corporation, International Doorway Music and Jacqueline Pinkston appeal from a judgment entered in favor of the defendants-appellees after a non-jury trial on the merits in plaintiffs' suit for alleged infringement of copyrights derived from a monologue entitled "Phone Call from Heaven."....
>
> In a careful opinion filed in the district court on January 19, 1977, United States District Judge L. Clure Morton declined to apply *Rosette v. Rainbo Record Manufacturing Corp.,* 354 F.Supp. 1183 (S.D.N.Y. 1973), *affirmed,* 546 F.2d 461 (2d Cir.1976) (affirmed on the basis of District Judge Gurfein's opinion). Judge Morton specifically disagreed with Judge Gurfein's holding that a sound recording could not under then-existing copyright law be a "copy" of the underlying composition. Judge Morton further distinguished Rosette on the basis of the evidence before him that Ray

Pinkston had never in the first instance prepared a written manuscript of the underlying monologue and that, therefore, the tape itself was properly an original and not a copy. We agree.

> After hearing the evidence, Judge Morton concluded that the rights to "Phone Call from Heaven" were in the public domain because plaintiff Pinkston and her husband had authorized a general unrestricted reproduction and publication of the recording....
>
> Upon a careful review, *the court is of the opinion that the district judge properly rejected the Rosette case as an applicable rule of copyright law.* The court is further of the opinion that the district judge's findings concerning the distribution and dissemination of the tape recordings and concerning the non-originality of the Jordan version of the original monologue are not clearly erroneous. Accordingly,
>
> IT IS ORDERED that the judgment of the district court is affirmed.

*Id.* (slip op. at 1) (emphasis added).

The *Leeds* case was an appeal from the decision of United States District Judge L. Clure Morton of this Court. Judge Morton filed, in pertinent part, the following opinion:

> Plaintiffs also maintain that the dissemination of Ray Pinkston's monologue did not constitute a publication at all, general or limited, because a sound recording has been judicially determined not to be a "copy" of the underlying composition. Plaintiff relies primarily on the case of *Rosette v. Rainbo Record Mfg. Corp.,* 354 F.Supp. 1183 (S.D.N.Y.1973), *aff'd,* 546 F.2d 461 (2d Cir.1976) in support of this proposition.
>
> While the foregoing seems to be the prevailing view of the Second Circuit, (citations omitted), it is by no means the clear majority rule, (citations omitted), and has been roundly criticized by Professor Nimmer. (citation omitted). Nor, as Nimmer observes, does such a theory comport with the underlying rationale of the publication doctrine. (citation omitted). Moreover, since it appears from the evidence in the instant case that no "underlying composi-

tion" ever existed as to the Pinkston monologue, the applicability of the doctrine urged by plaintiffs is highly questionable. The raison d'etre of that theory is that the sounds produced by a phonograph record or recording tape cannot reasonably be deemed "copies" of a written manuscript, and so distribution of those sounds cannot really be deemed a "publication" of the original written work. Where, as here, the original work is itself a sound recording, the sound reproduced from it, being in the same medium as the original, are, in every sense of the word, "copies" of the original. *Thus, even if this court were inclined to adopt the Second Circuit's approach, which it is not, the cases cited by plaintiffs are inapplicable.*

*Leeds v. Gusto,* 75–284, 601 F.2d 589 (M.D.Tenn. Jan. 19, 1977) (slip op at 16-17). (emphasis added).

Under the circumstances where the Sixth Circuit has expressly repudiated *Rosette,* and thereby affirmed a District Judge of this Court in his refusal to follow Rosette, albeit in unpublished opinions, it appears that *Rosette* is not good law in the Sixth Circuit or this District Court. In any event, the Court finds that *La Cienega* is the better reasoned view and declines to follow *Rosette.*

■ Application of the *La Cienega* publication rule to the facts of this case indicates that the public distribution of the four phonograph records at issue, without copyright notices attached, placed the underlying musical compositions of these works into the public domain. The Court, therefore, holds that the compositions "All–American Boy," "Apartment # 9," "Don't Monkey With Another Monkey's Monkey," and "How Fast Them Trucks Can Go" are in the public domain.

Plaintiffs take the position that this Court should follow *Rosette* because *La Cienega* is a "renewal" case and not a "notice" case. The Court finds such a distinction immaterial and inaccurate.[8] The important point is that both *La Cienega* and *Rosette* address the issue of when a phonorecord is published for

purposes of the 1909 Copyright Act. As discussed above, when a work is published is pivotal to whether a copyright notice is required. Plaintiffs also distinguish the Leeds case on the basis that no underlying manuscript was made of the composition recorded on the phonorecord at issue. Although this is correct, it is not outcome determinative. Both the District Court and the Sixth Circuit in *Leeds* firmly rejected *Rosette.*

Finally, Plaintiffs assert that the Rosette case should be followed based on the instructions on the copyright forms, published by the Copyright Office, that they used to register the musical compositions at issue in this case. The copyright form, for instance, for "All–American Boy" provides as follows:

> *Sound Recordings.* Phonograph records, tape recordings, and other sound recordings are not regarded as "copies" of the musical compositions recorded on them and are not acceptable for copyright registration. For purposes of deposit, the musical composition should be written in some form of legible notation. If the composition contains words, they should be written above or beneath the notes to which they are sung.

Plaintiffs cite this provision out of context. It concerns the mechanics of copyright registration and what may be deposited, rather than if and when a work is deemed "published." In any event, the Court must follow the 1909 Copyright Act, as authoritatively interpreted, and it is not bound by administrative forms.

For the reasons described above, the Court grants Defendants' Motion for Partial Summary Judgment on the copyright notice issue.

### V. Copyright Renewal Issue

The next issue for consideration is whether the application for copyright renewal for "Sunnyside of the Mountain" and "Patanio, Pride of the Plain" that was filed before the one year period immediately prior to the expiration of the original copyright registra-

---

**8.** In *La Cienega,* the Court found no attempt was made to renew two of the works and remanded the case regarding a third work to determine if

the statutory requirements, such as notice, were satisfied. *La Cienega,* 53 F.3d at 954.

tion renewed the copyrights. If the copyrights were not renewed, then the works passed into the public domain.

Section 24 of the Copyright Act of 1909 provides:

The *copyright secured by this title shall endure for twenty-eight years from the date of first publication,* whether the copyrighted work bears the author's true name or is published anonymously or under an assumed name: *Provided,* That in the case of any posthumous work or of any periodical, cyclopedic, or other composite work upon which the copyright was originally secured by the proprietor thereof, or of any work copyrighted by a corporate body (otherwise than as assignee or licensee of the individual author) or by an employer for whom such work is made for hire, the proprietor of such copyright shall be entitled to a *renewal and extension of the copyright in such work for the further term of twenty-eight years when application for such renewal and extension shall have been made to the copyright office and duly registered therein within one year prior to the expiration of the original term of copyright:* And *provided further,* That in the case of any other copyrighted work, including a contribution by an individual author to a periodical or to a cyclopedic or other composite work, the author of such work, if still living, or the widow, widower, or children of the author, if the author be not be living, or if such author, widow, widower, or children not be living, then the author's executors, or in the absence of a will, his next of kin shall be entitled to a *renewal and extension of the copyright in such work for a further term of twenty-eight years when application for such renewal and extension shall have been made*

*to the copyright office and duly registered therein within one year prior to the expiration of the original term of copyright:* And *provided further, That in default of the registration of such application for renewal and extension, the copyright in any work shall determine at the expiration of twenty-eight years from first publication.*

Copyright Act of 1909, Ch. 320, §§ 23 and 24, 35 Stat. 1075, 1080–81 (emphasis added); *5 Nimmer on Copyright,* App. 6–26(1996). (Sections 23 and 24 of the Copyright Act of 1909 were combined and codified as 17 U.S.C. § 24.[9])

The parties have cited only one case on the renewal issue. *International Film Exchange Ltd. v. Corinth Films, Inc.,* 621 F.Supp. 631 (S.D.N.Y.1985). The *International Film* Court held:

Under the 1909 Act, statutory copyright protection attached and endured for twenty-eight years from the date of first publication with notice. (citation omitted). Thereafter, an application for renewal of copyright would have had to have been filed with the Copyright Office within one year prior to the expiration of the original term of copyright in order to extend the copyright protection afforded by the statute. (citations omitted). Thus, the initial term of copyright in the Film expired December 6, 1976, and an application for a valid renewal would have had to have been filed between December 6, 1975 and December 6, 1976.

*Id.* at 634.

*Nimmer on Copyright* provides:

Section 304(a) of the Copyright Act originally provided that an application for re-

---

9. Section 24 originally provided:

That the copyright subsisting in any work at the time when this Act goes into effect may, at the expiration of the term provided for under existing law, be renewed and extended by the author of such work if still living, or the widow, widower, or children of the author, if the author be not living, of if such author, widow, widower, or children of the author, if the author be not living, then by the author's executors, or in the absence of a will, his next of kin, for a further period such that the entire term shall be equal to that secured by this Act,

including the renewal period: *Provided, however,* That if the work be a composite work upon which copyright was originally secured by the proprietor thereof, then such proprietor shall be *entitled to the privilege of renewal and* extension granted under this section: *Provided,* That application for such renewal and extension shall be made to the copyright office and duly registered therein within one year prior to the expiration of the existing term. Copyright Act of 1909, Ch. 320, § 24, 35 Stat. 1075, 1080–81; *5 Nimmer on Copyright,* App. 2–26(1996).

newal of copyright had to be "made to the Copyright Office and duly registered therein within one year prior to the expiration of the original term of copyright." ... Under it, a renewal application could only be made during the 28th year of the original term of copyright, and failure to claim a renewal within such period resulted in the work irrevocably entering the public domain upon the expiration of such original term.

. . . .

Thus, if a copyright were first secured on August 2, 1962, the 28th year expired at the end of August 1, 1990. Under the 1909 Act, this would have meant that the renewal application would need to be filed at anytime from August 2, 1989, until August 1, 1990.

*5 Nimmer on Copyright,* § 9.05[B][1], at 9–68.1 (1996).

Under Section 24 of the Copyright Act of 1909, renewal occurs "when application for such renewal and extension shall have been made to the copyright office and duly registered therein within one year prior to the expiration of the original term of copyright." The renewal issue, therefore, turns on what the phrase "within one year prior to the expiration of the original term of copyright" means.

The word "within" is commonly defined in dictionaries as "inside" or "inside the fixed limits of: not beyond," along with other similar definitions. *Webster's II New College Dictionary* 1268 (1995); *Webster's Third New International Dictionary* 2627 (1993).

■ The Court finds that the phrase "within one year prior to the expiration of the original term of copyright" in Section 24

of the Copyright Act of 1909 means that a copyright renewal application must be filed inside the relevant one year period, and not either before the commencement of such period or after the termination of such period.

■ Applying this legal conclusion to the facts presented in this case, the Court holds that the application for copyright renewal for "Sunnyside of the Mountain" and "Patanio, Pride of the Plain" did not renew the original copyrights because it was not filed within, or inside, the one year period immediately prior to the expiration of the original copyright. The application for renewal was filed three days too early and thus is ineffective. Accordingly, "Sunnyside of the Mountain" and "Patanio, Pride of the Plain" are in the public domain.

Plaintiffs take the position that the Copyright Office approved the application for renewal and, therefore, the musical compositions at issue were validly renewed. Although the Court may consider the administrative actions of the Copyright Office, it is not bound by such actions in determining the law and applying it to the facts of a particular case. Finally, Plaintiffs assert that the Copyright Act of 1976 cured any errors they made in the renewal process under the 1909 Copyright Act. Plaintiffs cite no authority for this proposition and the Court, accordingly, rejects it.[10]

For the reasons described above, the Court grants Defendants' Motion for Partial Summary Judgment on the renewal issue.

### VI. Conclusion

The Court is mindful that the application of the formalities of the 1909 Copyright Act can produce seemingly harsh results.[11] The

---

**10.** Under the Copyright Act of 1976, effective January 1, 1978, "If on that date a work was already in the public domain under the 1909 Act or earlier laws, the work remains in the public domain and no copyright protection is available." R. Gorman, *Copyright Law,* (Federal Judicial Center 1991), at 43; see Transitional and Supplemental Provisions, Section 103 of Pub.L. 94–553, Title I, October 19, 1976, 90 Stat. 2599. ("This Act [enacting this tide] does not provide copyright protection for any work that goes into the public domain before January, 1978"). The original copyright of the two works at issue ex-

pired in 1973, five years before the effective date of the Copyright Act of 1976.

**11.** Plaintiffs argue that *Rosette* reflects the standard in the industry. There is no evidence in the record on this point. The Court does note that there was an approximately twenty year gap between *Rosette* (1976) and *La Cienega* (1995). However, *Rosette* (November 11, 1976) was rejected by this District Court in *Leeds* (January 19, 1977) approximately two months after it was decided. Any reliance on *Rosette* in the United

Sixtieth Congress, nevertheless, struck the balance between protecting the rights of authors through a limited monopoly versus the unfettered dissemination of information to promote knowledge. It is not the job of this Court to rewrite the balance of competing interests selected by the Congress. It is the duty of this Court to apply the law as written and authoritatively interpreted by the Courts.

The Court grants Defendants' Motion for Partial Summary Judgment (Docket No. 22). The parties shall file on or before May 5, 1997, their positions on what issues remain to be decided in this case and a proposed schedule for consideration of all pending matters.

It is so ORDERED.

States District Court for the Middle District of　　Tennessee was misplaced.