**Mahlon DOLMAN, Plaintiff–Appellee,**

v.

**Michael AGEE; Michael Agee Productions; L & H Records; The Nostalgia Archive, Defendants–Appellants.**

Nos. 96–56778, 97–56040.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 4, 1998.

Decided Oct. 5, 1998.

Louis P. Petrich, Vincent Cox, Leopold, Petrich & Smith, Los Angeles, California, for defendants-appellants.

Dian S. Rubanoff, Lane Powell Sears Lubersky, Portland, Oregon, for plaintiff-appellee.

Before: BRUNETTI, THOMPSON, and T.G. NELSON, Circuit Judges.

BRUNETTI, Circuit Judge:

In this copyright action, the plaintiff-appellee Mahlon Dolman alleges that the defendants-appellants, Michael Agee, Michael Agee Productions, L & H Records, and The Nostalgia Archive, infringed on Dolman's copyrights in motion picture soundtrack musical compositions created by Dolman's stepfather, Leroy Shield, in the 1930s. The district court granted partial summary judgment for Dolman as to twenty-five (25) of the subject songs. After a bench trial, the district court entered an order finding that the defendants infringed Dolman's copyrights on all of the songs at issue, and entered judgment in favor of Dolman, including a permanent injunction against further infringement. Defendants-appellants now appeal from that judgment, as well as from the district court's award of attorney's fees to Dolman. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

## FACTS AND PROCEEDINGS BELOW

Leroy Shield (Shield), the stepfather of plaintiff-appellee Mahlon Dolman (Dolman), was employed by Victor Talking Machine (Victor) in the 1930s, when Shield authored the songs at issue in this case. In 1928, Hal Roach Studios (HRS) contracted with Victor to create soundtracks for HRS-produced motion pictures. Shield composed the musical portions of the soundtracks for Laurel and Hardy movies produced by HRS and released by Metro–Goldwyn–Mayer (MGM) in the early 1930s. MGM registered copyrights for all of these movies.

In January 1932, Shield assigned his interest in the subject songs to Southern Music Publishing Company (Southern), which was the music publishing arm of Victor. In the assignment, Shield stated that the songs were his own compositions; that they were his property free from any liens or claims; and that they had not previously been assigned, transferred, or sold.

Southern then registered the original term copyrights for the songs, naming itself as copyright owner and Shield as composer, and proceeded to publish the songs as sheet music. Eventually, Southern assigned the copyrights in the songs to Peer International Corp. (Peer), and Peer later assigned the copyrights back to Southern. Southern also granted a synchronization license for the songs to HRS in 1932.

In 1958, both Southern and the Songwriters' Guild timely renewed the song copyrights in Shield's name. Subsequently, Shield established the Roy Shield Music Company for the purpose of licensing the songs to third persons during the renewal term.

In 1962, Shield died and left his entire estate to his widow, Katherine Shield. Katherine Shield died in February 1976, leaving her entire estate in equal thirds to her sister, Marguerite Sullivan, and her two sons, Dolman and his brother, Harold Glaisyer. In December 1976, Sullivan gifted her interest

in the songs to Dolman. Dolman has thus held a two-thirds (2/3rds) interest in the songs at all times since 1976. He and his brother continue to conduct business as the Roy Shield Music Company.

Defendant-appellant Michael Agee did business under the names of defendant L & H Records and defendant The Nostalgia Archive (collectively referred to herein as "Agee"). After receiving permission from Hal Roach (Roach) and Earl Glick (Glick), the Chairman of HRS, Agee, a film historian and restorationist, caused to be manufactured and distributed "Music Box" phonorecords containing renditions of the songs at issue in this case. Agee also imported 150 CDs recorded by the Dutch "Beau Hunks" Orchestra, containing some of the subject songs.

While Agee was assured by Roach and Glick that HRS owned the music at issue, Agee had a copyright attorney, Walter Hurst (Hurst), investigate the copyright status of the songs prior to the release of the first "Music Box" album. Hurst reported to Agee that the copyright situation was "a mess." Nonetheless, Agee went forward with the release.

In 1990, Agee learned of the Roy Shield Music Company. Thereafter, he called Dolman and asked for biographical information on Leroy Shield. When Dolman learned about the distribution of the "Music Box" albums, he twice informed Agee in writing that he expected Agee to arrange for a license for use of the songs written by Shield. Agee did not respond to either of Dolman's letters until 1993, when Agee wrote Dolman a letter acknowledging Dolman's ownership of the music. However, Agee never offered to obtain a license from Dolman.

In June 1993, Dolman's lawyer sent Agee a letter demanding that he pay a license fee and account for sales to date of the allegedly infringing albums. In September 1993, the lawyer sent Agee documentation of Dolman's copyright ownership. A friend of Agee's then called Dolman's lawyer to request that, as part of any license, Dolman agree to indemnify Agee for any claims of ownership by third parties. Dolman declined to grant a license on those terms. Agee continued to sell the albums.

Dolman commenced this action on March 14, 1994, alleging a two-thirds (2/3rds) interest in fifty-five (55) song copyrights for the songs authored by Shield. Dolman moved for partial summary judgment as to twenty-five (25) songs, and his motion was granted on March 29, 1995. The district court then proceeded to a bench trial on the remaining issues.

On October 8, 1996, the district court issued its findings of fact and conclusions of law, holding in favor of Dolman. Judgment was entered for Dolman in the amount of $23,333.33 plus costs, and Agee was permanently enjoined from further infringement on October 18, 1996. On June 3, 1997, the district court awarded Dolman attorney's fees pursuant to 17 U.S.C. § 505 as the prevailing party. This appeal by Agee followed.

## DISCUSSION

### I. Standards of Review

A grant of summary judgment is reviewed de novo. *Covey v. Hollydale Mobilehome Estates*, 116 F.3d 830, 834 (9th Cir. 1997), *as amended by* 125 F.3d 1281 (9th Cir.1997). We must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Id.*

A district court's findings of fact following a bench trial are reviewed for clear error, and its conclusions of law are reviewed de novo. Fed.R.Civ.P. 52(a); *Magnuson v. Video Yesteryear*, 85 F.3d 1424, 1427 (9th Cir.1996).

### II. The Subject Songs Were Not "Works for Hire"

Agee first argues that the district court erred in finding that the songs written by Shield were not works for hire. We agree with the district court.

Under the Copyright Act of 1909, Act of March 4, 1909, ch. 320, 35 Stat. 1075

(codified at 17 U.S.C. §§ 1–216) (repealed), there is a rebuttable presumption that when an employer hires an employee or independent contractor to produce work of an artistic nature, the employer owns the copyright in the work. *See May v. Morganelli–Heumann & Assocs.*, 618 F.2d 1363, 1368 (9th Cir.1980); *Lin–Brook Builders Hardware v. Gertler*, 352 F.2d 298, 300 (9th Cir.1965).[1] In *Lin–Brook*, we explained the "works for hire" doctrine in the following manner:

> [W]hen one person engages another, whether as employee or as an independent contractor, to produce a work of an artistic nature, that in the absence of an express contractual reservation of the copyright in the artist, the presumption arises that the mutual intent of the parties is that the title to the copyright shall be in the person at whose instance and expense the work is done.

*Lin–Brook*, 352 F.2d at 300.

The work for hire presumption can be overcome by evidence of an agreement by which the employee or independent contractor retained the copyright in his work. *See May*, 618 F.2d at 1368–69. The employee-plaintiff bears the burden of proving by a preponderance of the evidence that such a contrary agreement was reached. *See Id.* at 1369.

In the district court, Agee asserted the affirmative defense of work for hire. Before the work for hire presumption could be invoked, however, Agee was required to present some credible evidence that Shield's work was done at the "instance and expense" of either Hal Roach or Victor. According to Agee, the evidence shows that the subject songs were composed at the "instance and expense" of HRS, and "in the course and scope of Shield's employment by Victor." The district court found that Agee failed to meet his initial burden of production on this issue, and we agree.

As evidence of work for hire, Agee points to the fact that at the time he authored the songs, Shield was working for Victor on HRS-produced movies. As noted above, in 1928, HRS and Victor entered into an agreement for the recording of sound in connection with the manufacture of motion pictures. The agreement remained in place until 1931, and the movies in question here were part of the performance of that contract. It is undisputed that Shield was an employee of Victor at the time the movies were produced and the songs in question were written.

Agee also cites letters from Southern to both Shield and Peer, in which Southern states that Shield's works had been composed for HRS. Finally, Agee presents invoices for Shield's "services," showing that he worked on the movies at issue.

Dolman responds by pointing out that the invoices presented to the district court merely showed that Victor billed HRS for Shield's "services"; however, there was no indication as to what those "services" were. Dolman also notes that on the back of the allegedly infringing "Music Box" albums, Agee wrote that Leroy Shield was a "consultant" supplied by Victor to HRS. Shield's actual position at Victor as of 1926 was "Head of Artists and Repertoire for the Western United States" and, as of 1932, "Western Musical Director for RCA Victor's National Broadcasting Company." Dolman thus argues, and we agree, that there is neither evidence that composing music for HRS was within the scope of Shield's employment with Victor, nor evidence that the songs were written at the instance and expense of HRS. Accordingly, the district court did not err in refusing to apply the work for hire doctrine.

Moreover, even if Agee had established that Shield created the songs at the instance and expense of Victor or HRS, Dolman rebutted the work for hire presumption, which "is based on the presumed mutual intent of the parties, and does not operate as a matter of law." *May*, 618 F.2d at 1368.

The district court was presented with the following evidence of the parties' mutual in-

---

1. The district court properly applied the 1909 Copyright Act to determine whether the songs created by Shield in the 1930s were "works for hire" whose copyright presumptively vested in his employer. The 1909 Act is the applicable law in cases in which creation and publication of a work occurred before January 1, 1978, the effective date of the 1976 Act. *See Magnuson*, 85 F.3d at 1427.

tent at the time the songs were written. First, Shield assigned his rights to the subject songs to Southern, which was owned by Victor. Had the works been intended to be works for hire for Victor, there would have been no reason for Southern to accept an invalid assignment of rights from Shield, knowing that its parent company already owned those rights. Following the assignment, Southern filed copyright registrations on the songs, naming Shield as the composer. Moreover, Southern later renewed the copyrights for some of the songs in Shield's name. Southern also assured Shield in writing that "[i]n the event any of these selections are not actively promoted by us, we agree to assign them to you on demand." Finally, in 1932, Southern licensed the synchronization rights in the songs to HRS. Had the songs been written for HRS as works for hire, there would have been no need for such a license.

We hold that the above-cited evidence was sufficient to rebut the presumption that the songs composed by Shield were intended to be works for hire.[2]

### III. Agee Presented Insufficient Evidence of "Publication" of the Motion Pictures

Agee next contends that Shield lost his common-law copyright in the songs when the motion pictures were released. According to Agee, the prior publication of the motion pictures by distribution to film exchanges, without Shield's separate copyright notice for the songs, injected the underlying musical compositions into the public domain, and thus divested the musical compositions of their common-law copyrights. The district court rejected this argument, holding, as a matter of law, that the publication of a motion picture is not a publication of the underlying musical compositions.

Under the Copyright Act of 1909, a properly recorded artistic work receives copyright protection for 28 years from the date of first publication, and the author may renew the copyright term for an additional 28–year

period. 1909 Act, ch. 320, § 23, 35 Stat. 1075, 1080. Under the 1909 Act, an unpublished work was protected by state common-law copyright from the moment of its creation until it was either published or until it received protection under the federal copyright scheme. *La Cienega Music Co. v. ZZ Top*, 53 F.3d 950 (9th Cir.), *cert. denied*, 516 U.S. 927, 116 S.Ct. 331, 133 L.Ed.2d 231 (1995) (citations omitted). When a work was published, it lost common-law protection. *Id.* at 952–53. However, the owner could obtain federal protection for the published work by complying with the requirements of the 1909 Act. *Id.* at 953. If the owner failed to satisfy the Act's requirements, the work was injected irrevocably into the public domain. *Id.*

We have held that "publication occurs when by consent of the copyright owner, the original or tangible copies of a work are sold, leased, loaned, given away, or otherwise made available to the general public...." *American Vitagraph, Inc. v. Levy*, 659 F.2d 1023, 1027 (9th Cir.1981) (quoting *Nimmer on Copyright* § 4.04 at 4–18 to 4–19). However, "mere performance or exhibition of a work does not constitute a publication of that work.... [A] motion picture exhibition where the viewing audience is merely permitted to see the work is not a publication." *Id.* at 1027 (citations omitted); *see also Nimmer* § 4.11(A) at 4–53 ("[I]t is clear that the projection or exhibition of a motion picture in theatres or elsewhere does not in itself constitute a publication").

We have also held that "it takes more in the way of publication to invalidate any copyright, whether statutory or common law, than to validate it." *American Vitagraph*, 659 F.2d at 1027. "[I]n the context where a forfeiture of copyright protection is at stake ... *publication of a motion picture does not occur until the film is in commercial distribution—when copies of a film are placed in the regional exchanges for distribution to theatre operators.*" *Id.* at 1029 (emphasis added). Thus, under our case law, it takes "more" publication to destroy a com-

---

**2.** Agee also argues that the district court misappropriated the burdens of proof on the works for hire issue. To the contrary, the trial transcript shows that district court was well aware that the

Dolman bore the ultimate burden of proof to rebut any credible evidence that the songs were composed as works for hire.

mon-law copyright than to perfect a statutory copyright.

Turning to the present case, we find no evidence in the record to support a finding that the movies at issue here were "published," as that term is defined in *American Vitagraph*. Thus, we must affirm the district court's finding that the subject songs were not injected into the public domain by way of publication of the motion pictures.

The only evidence of publication presented by Agee to the district court was the motion picture copyright certificates, with publication dates listed. Putting aside the district court's concerns regarding the accuracy and completeness of this evidence, Agee is correct that we must afford the copyright registrations a presumption of validity. *See Academy of Motion Picture Arts and Sciences v. Creative House Promotions, Inc.*, 944 F.2d 1446, 1451 (9th Cir.1991). Section 209 of the 1909 Act provides that a certificate of registration shall be prima facie evidence of the facts stated therein. *Id.* Thus, the certificates of registration for the subject motion pictures create a rebuttable presumption that the movies were published for purposes of investing statutory copyright on the dates listed. They do not, however, prove that the movies were "published," under the *American Vitagraph* definition, to the extent that they divested the songs of their common-law copyrights. *See American Vitagraph*, 659 F.2d at 1027–28.

Nonetheless, Agee argues that *La Cienega* requires us to hold that the "publication" of a motion picture also "publishes" the underlying musical compositions, with the compositions thereby losing their common-law copyright protection absent a separate copyright notice. In *La Cienega*, we held that a record is a "copy" of the work recorded, and that the underlying compositions on the record are therefore "published" at the time the recordings are sold to the public. *La Cienega*, 53 F.3d at 953. Thus, where a composer fails to satisfy the requirements of the 1909 Act, his compositions enter the public domain immediately upon sale of recordings to the public. *Id.* at 954. *But see Rosette v. Rainbo Record Mfg. Corp.*, 354 F.Supp. 1183 (S.D.N.Y.1973), *aff'd per curiam*, 546 F.2d 461 (2d Cir.1976) (holding that a record is not a "copy" of a musical composition, and sale of a record is not a publication divesting the composer of his common-law copyright).[3]

Agee's reliance on *La Cienega* is unavailing. Nothing contained in that opinion suggests that a copyright certificate, standing alone, is sufficient to demonstrate a publication that divests a work of its common-law copyright. To the contrary, the infringer in *La Cienega* relied on the *general release* of a phonorecord to the public in arguing that divestive publication had occurred. *La Cienega*, 53 F.3d at 953. Here, Agee did not introduce evidence demonstrating the nature and scope of the distribution of the Laurel & Hardy movies. As a result, the evidence is insufficient to establish the standard for publication set forth in *American Vitagraph*. *See American Vitagraph*, 659 F.2d at 1028 ("[M]otion picture publication occurs when prints of a film are made available under a lease or similar arrangement to theatre operators for public exhibition.") Nothing in *La Cienega* remedies this shortfall in the evidence.[4]

## IV. The District Court Did Not Err in Finding Willful Infringement

The district court found, pursuant to 17 U.S.C. § 504(c)(2), that Agee willfully infringed Dolman's copyrights because he continued producing and marketing the "Music Box" records, and began importing the Beau

---

3. Agee also cites *Maljack Productions, Inc. v. GoodTimes Home Video Corp.*, 81 F.3d 881 (9th Cir.1996). This case is inapposite because the *Maljack* court was merely interpreting a contract between the parties as to ownership of synchronization rights. Moreover, the court explicitly stated that it was not deciding "whether the synchronization rights existed as part of the music copyrights, the movie copyrights, or independently...." *Id.* at 885 n. 3.

4. Because we hold that there was insufficient evidence of publication presented to the district court, we need not reach the still unsettled question of whether, under the 1909 Act, publication of a motion picture with the prescribed copyright notice provides copyright protection for the motion picture soundtrack and underlying musical compositions as "component parts" of the copyrighted movie.

Hunks records, despite knowing that *someone* owned the copyrights in the music, and being presented with evidence regarding Dolman's claim of ownership.

 In the copyright infringement context, "willful" means acting "with knowledge that [one's] conduct constitutes copyright infringement." *See Columbia Pictures Television v. Krypton Broadcasting of Birmingham, Inc.,* 106 F.3d 284, 293 (9th Cir. 1997), *rev'd on other grounds by Feltner v. Columbia Pictures Television, Inc.,* — U.S. ——, 118 S.Ct. 1279, 140 L.Ed.2d 438 (1998). The district court's finding of willful infringement is reviewed for clear error. *Id.*

Agee argues that the district court's findings were clearly erroneous because he demonstrated a reasonable good faith belief in the innocence of his conduct. *See Columbia Pictures,* 106 F.3d at 293. According to Agee, any infringement was not willful because the title situation regarding the copyrights for the Shield songs was cloudy. Further, Agee claims that he had reason to believe that HRS, which gave him permission to use the songs, owned the copyrights. Agee did in fact have the approval of Roach and Glick of HRS to distribute the Music Box records. However, after consulting with copyright counsel, Agee was told that the situation with respect to the songs was "a mess."

As to the Beau Hunks' recordings, Agee imported those CDs after being solicited by a European licensee of HRS, who, it turns out, had rights to the music worldwide, except in the United States.

Agee also explains that he refused Dolman's offer to license the songs because Dolman would not promise to indemnify Agee in the event of a third-party claim. Agee contends that if Dolman had been sure that he was the titleholder, Dolman would have had no problem with such an indemnification agreement.

Because Agee continued to infringe on the song copyrights when he knew that there was a question as to their ownership, and when he was presented with evidence that Dolman was the true owner, the district court did not err in finding that Agee's infringement was willful.

## V. The District Court Properly Awarded Attorney's Fees

The district court awarded Dolman attorney's fees pursuant to 17 U.S.C. § 505. That section allows the court, in its discretion, to award to the prevailing party reasonable attorney's fees as part of costs. Because we affirm the district court's findings as to Agee's liability, we affirm the attorney's fee award as well.

AFFIRMED.