**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

TWENTIETH CENTURY FOX FILM
CORPORATION, a Delaware
Corporation; SFM ENTERTAINMENT
LLC, a Delaware limited liability
company; NEW LINE HOME VIDEO
INC., a New York Corporation,
  *Plaintiffs-Counter-Defendants-*
        *Appellees,*

v.

ENTERTAINMENT DISTRIBUTING, an
Oregon Corporation; MARATHON
MUSIC & VIDEO, an Oregon
Corporation,
   *Defendants-Appellants,*

DASTAR CORPORATION, an Oregon
Corporation,
  *Defendant-Counter-Claimant-*
        *Appellant,*

RANDOM HOUSE, INC., sued as
Doubleday, a division of Bantam
Doubleday Dell Publishing Group,
Inc.,
   *Counter-Defendant-Appellee.*

No. 03-57052

D.C. No.
CV-98-07189-FMC

15361

TWENTIETH CENTURY FOX FILM
CORPORATION, a Delaware
Corporation; SFM ENTERTAINMENT
LLC, a Delaware limited liability
company; NEW LINE HOME VIDEO
INC., a New York Corporation,
    *Plaintiffs-Counter-Defendants-*
                    *Appellees,*

v.

ENTERTAINMENT DISTRIBUTING, an
Oregon Corporation; MARATHON
MUSIC & VIDEO, an Oregon
Corporation,
    *Defendants-Appellants,*

DASTAR CORPORATION, an Oregon
Corporation,
    *Defendant-Counter-Claimant-*
                    *Appellant,*

RANDOM HOUSE, INC., sued as
Doubleday, a division of Bantam
Doubleday Dell Publishing Group,
Inc.,
    *Counter-Defendant-Appellee.*

No. 04-55410

D.C. No.
CV-98-07189-FMC

Twentieth Century Fox Film
Corporation, a Delaware
Corporation; SFM Entertainment
LLC, a Delaware limited liability
company; New Line Home Video
Inc., a New York Corporation,
          *Plaintiffs-Counter-Defendants-*
                              *Appellees,*

v.

Entertainment Distributing, an
Oregon Corporation; Marathon
Music & Video, an Oregon
Corporation,
          *Defendants-Appellants,*

Dastar Corporation, an Oregon
Corporation,
          *Defendant-Counter-Claimant-*
                              *Appellant,*

Random House, Inc., sued as
Doubleday, a division of Bantam
Doubleday Dell Publishing Group,
Inc.,
          *Counter-Defendant-Appellee.*

No. 03-57234
D.C. No.
CV-98-07189-FMC
OPINION

Appeal from the United States District Court
for the Central District of California
Florence Marie Cooper, District Judge, Presiding

Argued and Submitted
July 13, 2005—Pasadena, California

Filed November 18, 2005

Before: Jerome Farris, Dorothy W. Nelson, and
Richard C. Tallman, Circuit Judges.

Opinion by Judge Tallman;
Dissent by Judge D.W. Nelson

## COUNSEL

David A. Gerber, Oxnard, California, for the defendant-counter-claimant-appellant.

Jonathan D. Hacker, O'Melveny & Myers, Washington, D.C., Stephen G. Contopulos, Sidley Austin Brown & Wood, Los Angeles, California, for the plaintiffs-counter-defendants-appellees.

## OPINION

TALLMAN, Circuit Judge:

General Dwight D. Eisenhower's fascinating written account of World War II is the subject of a more mundane, present day battle over the copyright to that now famous book, *Crusade in Europe*. Dastar Corporation ("Dastar") appeals the district court's judgment in favor of Twentieth Century Fox Film Corporation ("Fox"), SFM Entertainment LLC, and New Line Home Video, Inc., (collectively, "Twentieth Century Fox Parties"), finding that Dastar infringed protected copyrights to *Crusade in Europe*, and the court's subsequent award of attorneys' fees and costs to Twentieth Century Fox Parties. We affirm.

# I

The district court entered judgment following a bench trial, and we set forth the pertinent facts in the light most favorable to the prevailing parties.

General Eisenhower served as Supreme Commander of the Allied Expeditionary Forces during World War II, following his service as Commander of the U.S. troops in Europe. Upon the surrender of the German military forces in 1945, numerous publishers approached General Eisenhower, offering him the opportunity to publish his memoirs about the war. General Eisenhower, however, spurned all such offers until Doubleday president Douglas Black and *The New York Herald Tribune* ("*Tribune*") vice-president William Robinson convinced him otherwise. General Eisenhower explained:

> [M]any months before I left the Army, I was approached by representatives of various publishing houses, each with a different reason for wanting to publish my memoirs of the war. To all these proposals I turned a deaf ear.
>
> . . .
>
> But finally two men, Douglas M. Black of Doubleday and William Robinson, of The New York *Herald Tribune*, came to me with a different kind of argument. Roughly it went like this:
>
> Historians, they said, are often inclined to use contemporary accounts as source materials . . . . They showed me, or reminded me of, a number of books which had been written hurriedly, so as not to "miss the market." Certain of these books on the African and European campaigns were riddled with inaccuracies. They contained conclusions that had slight basis in fact and were the hasty conceptions or mis-

conceptions of authors who had a flair for writing rapidly and fluently. Mr. Black and Mr. Robinson, who were functioning partners for the proposal, pointed out errors in these publications and said that since these were written during my lifetime and were not denied or corrected by me, the historians of the future might give them a high degree of credibility.

This reasoning impressed me. After I thought it over for a time, they came back and I said, "I'm ready to undertake this task but on one condition only: it seems to me that every time the subject is brought up, people talk about all the various kinds of publishing rights and so on and I don't want to be bothered with such things. Now if you people can come up with a single package to cover the whole affair so that I don't have to argue with too many people, I will probably undertake something.

DWIGHT D. EISENHOWER, AT EASE 324-25 (Doubleday & Company, Inc. 1967) (1967).

The evidence showed that despite General Eisenhower's initial reluctance, the thought of penning a personal account of his war experiences had previously crossed his mind. According to General Eisenhower, he had "tried to draft a bit of narrative just to satisfy [him]self that [he] had something to say that was worth hearing." But ultimately, General Eisenhower explained that he had "not convinced [him]self of this at all," and any work was merely an "experiment" "more as a protection to [him]self in the event [he] ever did want to write." He did not definitively decide to write and publish his memoirs, however, until approached by Messrs. Black and Robinson.

After hearing their initial pitch, General Eisenhower and his attorney met with representatives from *Tribune* and Doubleday in Washington, D.C., on December 30, 1947. Double-

day made General Eisenhower an attractive offer to publish his memoirs and he accepted the terms with a handshake. General Eisenhower wrote the next day that "all is settled on a 'gentleman's agreement' basis," further explaining that the matter had reached a "definite conclusion."

Prior to the December 30, 1947, meeting, Doubleday suggested to General Eisenhower that he could potentially avoid having the publishing deal taxed as ordinary income, and instead obtain more favorable capital gains treatment. General Eisenhower contacted the Internal Revenue Service ("IRS") and explained his situation. He asked the IRS for an opinion as to how the sale of the book and publication would be treated for tax purposes. The IRS explained that under 26 U.S.C. § 117 (since repealed) it could treat him as a nonprofessional, first-time writer, and if he adhered to a specific set of restrictions, the proceeds could be taxed as capital gains, instead of as salary. Specifically, the IRS explained that if General Eisenhower sold "all [his] right, title and interest" in the book after having held the completed manuscript for a period of six months, the proceeds of his deal would qualify for long-term capital gains treatment.

General Eisenhower explained to Doubleday that he would have to structure the transaction as his advisors directed, including specifically the need to account for the IRS' opinion that any written agreement could only be in the form of an option to purchase the manuscript in six months, in order to obtain the favorable tax treatment. Just after reaching the "handshake" agreement, General Eisenhower wrote to a friend that his lawyer "[wa]s collaborating with the Treasury Department and with the Doubleday people to see how a tentative instrument [could] be drawn up that can in no wise be interpreted either as a bona fide sale or as a 'contract for services.' " He later explained to Doubleday that although they could not have a formal contract in place, "at any time subsequent to six months, after my completion of the manuscript, I shall be prepared to enter into a contract with [Doubleday]

without regard to what any other publishing house might propose in the interim." Thus, the district court determined as a matter of fact that Doubleday understood that General Eisenhower could not have put their agreement into writing until six months *after* the completion of his first draft without jeopardizing favorable long-term capital gains treatment.

The district court further found that General Eisenhower began writing the book manuscript *after* he reached the agreement with Doubleday on December 30, 1947. The writing process took on almost mythic proportions. General Eisenhower typically worked approximately sixteen hours a day, dictating text in the morning and revising and editing drafts in the afternoon. Doubleday, for its part, not only supplied round-the-clock secretarial staff, researchers, and stenographers, but also supervised much of the work, and paid for the creation of maps and photos for inclusion in the book. Additionally, the Doubleday editorial board met with General Eisenhower in person on numerous occasions, and provided extensive comments and notes on the work in progress.

General Eisenhower completed the first draft of the manuscript on March 24, 1948. Just over six months later, as required by the IRS for favorable tax treatment, General Eisenhower memorialized the December 1947 "handshake agreement" in an October 1, 1948, written contract. The document signed by General Eisenhower stated that:

> In consideration of the sum of [REDACTED] to me in hand paid, the receipt of which is hereby acknowledged, I do hereby sell, assign, transfer and set over unto Doubleday & Company, Inc., for its own use, absolutely and forever, the manuscript of my War Memoir entitled CRUSADE IN EUROPE, and all rights of every nature pertaining thereto.

After execution of the written agreement, Doubleday sold to Fox exclusive television rights to the book, agreeing to reg-

ister the copyright and granting it the right to use portions of the text as part of the narration in any film version of the book. Thereafter, in 1948, Doubleday obtained certificates of registration for the copyrights to the book. Fox subsequently produced just such a film, also titled *Crusade in Europe* ("*Crusade in Europe* Video"), in 1953. Fox later sublicensed the right to distribute the *Crusade in Europe* Video to SFM Entertainment, which in turn sublicensed manufacture and distribution rights over home videocassettes to New Line Home Video.

In 1995, Dastar created its own video documentary named *Campaigns in Europe.* The Twentieth Century Fox Parties sued Dastar, alleging that *Campaigns in Europe* infringed on *Crusade in Europe* by using large sections of the book's text as part of the video narration without permission. Dastar subsequently asserted several counterclaims against Twentieth Century Fox Parties, which later amended their complaint to include a claim that Dastar had violated § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and California unfair competition law.

Twentieth Century Fox Parties and Dastar raised cross-motions for summary judgment. The district court granted Twentieth Century Fox Parties' motion on both the Lanham Act claim and the copyright claim, and denied Dastar's motion in full. After issuing its summary judgment ruling the district court granted Twentieth Century Fox Parties' motion for attorneys' fees under § 505 of the 1976 Copyright Act. 17 U.S.C. § 505. The district court determined that Twentieth Century Fox Parties were wholly successful in their suit, that Dastar's copyright defense was "objectively unreasonable," that Dastar's litigation tactics were motivated by "bad faith," and that an award of attorneys' fees and costs was necessary to deter Dastar from further infringement.

Dastar brought an earlier appeal challenging the district court's summary judgment ruling. In an unpublished memo-

randum decision, we affirmed the district court's judgment on the Lanham Act claims, but reversed and remanded the copyright claims, holding that there were genuine issues of material fact as to General Eisenhower and Doubleday's intent on the work-for-hire issue. Dastar successfully petitioned for writ of certiorari on the Lanham Act claims, and the Supreme Court reversed and remanded the case back to us. *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 38 (2003). We then remanded the case back to the district court with instructions to dismiss the Lanham Act claim with prejudice.

In its summary judgment appeal, Dastar had also appealed the fee award, arguing that the fee request was not adequately documented and that the fee rates and hours billed were excessive. We rejected both arguments, but in light of our reversal of the district court's summary judgment in favor of Twentieth Century Fox Parties on the copyright claim, we vacated the fee award and remanded to the district court to recalculate the fees once the copyright claim had been resolved.

Subsequently, the district court granted Dastar's motion for summary judgment and dismissed Twentieth Century Fox Parties' unfair competition claim. With only the copyright claim remaining, the parties then submitted to a bench trial, during which the district court admitted hundreds of exhibits, including General Eisenhower's correspondence, notes, and recorded recollections. Dastar did not call any witnesses at trial, relying solely on the documentary evidence submitted and its cross-examination of Twentieth Century Fox Parties' only witness, Samuel Vaughn, a Doubleday editor who worked closely with General Eisenhower. After entering lengthy findings of fact and conclusions of law, the district court determined that General Eisenhower's book was created as a work-for-hire within the definition of the statute, and that Dastar's video infringed the copyright to the book.

Upon conclusion of the bench trial, the court again considered the issue of attorneys' fees, and granted Twentieth Century Fox Parties' motion. In its opinion, the district court incorporated by reference its earlier opinion awarding fees. In its new order, the district court held that for the same reasons it had stated previously, Twentieth Century Fox Parties were still entitled to a fee award because they had prevailed. The district court recalculated the lodestar fees from its December 2000 award based on expenses incurred in defending the summary judgment appeal and reduced the fees based on the subsequently dismissed Lanham Act claim.

Dastar appeals both the district court's adverse judgment on Twentieth Century Fox Parties' copyright infringement claim and the district court's subsequent re-award of attorneys' fees. We affirm.

## II

We first consider Twentieth Century Fox Parties' infringement claims under the now repealed Copyright Act of 1909, 17 U.S.C. § 1, 61 Stat. 652-61 (repealed 1976) ("1909 Act"), because *Crusade in Europe* was published before the January 1, 1978, effective date of the 1976 Copyright Act ("1976 Act"), 17 U.S.C. § 101. *Dolman v. Agee*, 157 F.3d 708, 712 n.1 (9th Cir. 1998). To demonstrate copyright infringement, the plaintiff must prove ownership of a valid copyright and copying of constituent elements of the work that are original. *Walker v. University Books, Inc.*, 602 F.2d 859, 862 (9th Cir. 1979). Dastar's defense hinges on its attempt to demonstrate that Doubleday did not own a valid copyright in *Crusade in Europe* in 1995 because Doubleday's purported attempt to renew the copyright in 1975 was ineffective.

**[1]** Section 24 of the 1909 Act provides that the initial copyright shall last for twenty-eight years. 1909 Act, 17 U.S.C. § 24. The proprietor of "any work copyrighted . . . by an employer for whom such work is made for hire" is entitled

to a renewal and extension of the copyright for an additional term of twenty-eight years if the employer makes the appropriate application for renewal within one year prior to the expiration of the copyright original term. *Id.*

**[2]** In the case of art not created as a work-for-hire, however, only the author may renew the copyright in the final year of the initial twenty-eight year period. *Id.* If the author is not alive during the one-year renewal period, then such right of renewal passes to the surviving spouse, or children of the author, then to the executors of the author's estate, or in the absence of a will naming executors, to the next of kin. *Id.* If no such renewal is made by the appropriate family member or executor, the copyright expires twenty-eight years from publication.[1] *Id.*

---

[1]In full, the 1909 Copyright Act states:

The copyright secured by this title shall endure for twenty-eight years from the date of first publication, whether the copyrighted work bears the author's true name or is published anonymously or under an assumed name: *Provided,* That in the case of any posthumous work or of any periodical, cyclopedic, or other composite work upon which the copyright was originally secured by the proprietor thereof, or of any work copyrighted by a corporate body (otherwise than as assignee or licensee of the individual author) or by an employer for whom such work is made for hire, the proprietor of such copyright shall be entitled to a renewal and extension of the copyright in such work for the further term of twenty-eight years when application for such renewal and extension shall have been made to the copyright office and duly registered therein within one year prior to the expiration of the original term of copyright: *And provided further*, That in the case of any other copyrighted work, including a contribution by an individual author to a periodical or to a cyclopedic or other composite work, the author of such work, if still living, or the widow, widower, or children of the author, if the author be not living, or if such author, widow, widower or children be not living, then the author's executors, or in the absence of a will, his next of kin shall be entitled to a renewal and extension of the copyright in such work for a further term of twenty-eight years when applica-

**[3]** Dastar argues that, as a matter of law, *Crusade in Europe* cannot be a work-for-hire because where as here, General Eisenhower authored the book as an independent contractor, Doubleday was not his "employer." We disagree. The 1909 Act does not provide any definition of "work made for hire" or "employer." *Estate of Burne Hogarth v. Edgar Rice Burroughs, Inc.*, 342 F.3d 149, 156 (2d Cir. 2003). It provides only in § 26 that "[i]n the interpretation and construction of this title . . . the word 'author' shall include an employer in the case of works made for hire." 1909 Act, 17 U.S.C. § 26. "Because the 1909 Act did not define 'employer' or 'works made for hire,' the task of shaping these terms fell to the courts." *Comm. for Creative Non-Violence v. Reid*, 490 U.S. 730, 744 (1989) ("*CCNV*"). Resolution of the issue thus becomes a mixed question of law and fact.

"Until the mid-1960's [sic], federal courts applied the work-for-hire doctrine only to cases in which a traditional employer/employee relationship existed between the hiring party and the creator of the work." *Playboy Enters., Inc. v. Dumas*, 53 F.3d 549, 554 (2d Cir. 1995). However, "[i]n the last decade that the [1909] Act was effective, courts expanded the concept to include less traditional relationships, as long as the hiring party had 'the right to control or supervise the artist's work.' " *Self-Realization Fellowship Church v. Ananda Church of Self-Realization*, 206 F.3d 1322, 1327 (9th Cir. 2000) (citation omitted).

Forty years ago, we explained the law of this circuit with respect to works-for-hire:

tion for such renewal and extension shall have been made to the copyright office and duly registered therein within one year prior to the expiration of the original term of copyright: *And provided further,* That in default of the registration of such application for renewal and extension, the copyright in any work shall determine at the expiration of twenty-eight years from first publication.

> [W]hen one person engages another, whether as employee or as an independent contractor, to produce a work of an artistic nature, that in the absence of an express contractual reservation of the copyright in the artist, the presumption arises that the mutual intent of the parties is that the title to the copyright shall be in the person at whose instance and expense the work is done.

*Lin-Brook Builders Hardware v. Gertler*, 352 F.2d 298, 300 (9th Cir. 1965); *see May v. Morganelli-Heumann & Assocs.*, 618 F.2d 1363, 1368 (9th Cir. 1980); *Dolman*, 157 F.3d at 711-12. Accordingly, we have consistently evaluated claims that a work was made for hire by asking whether it was created at the "instance and expense" of the engaging party. *See, e.g.*, *Dolman*, 157 F.2d at 712 (stating that a party asserting work-for-hire affirmative defense "was required to present some credible evidence that [the author's] work was done at the 'instance and expense' " of the commissioning party); *May*, 618 F.2d at 1368 n.4 ("What is necessary is that the artist produce the work at the instance and expense of the employer (or commissioning party) . . . .").

Dastar's argument that independent contractors cannot create works-for-hire as a matter of law essentially seeks to overturn forty years of established case law within this circuit, something we as a three-judge panel cannot and will not do. *Palmer v. Sanderson*, 9 F.3d 1433, 1437 n.5 (9th Cir. 1993) ("As a general rule, a panel not sitting en banc may not overturn circuit precedent."). It has been well established within this circuit that works by independent contractors may qualify as works-for-hire so long as they were created at the instance and expense of the commissioning party. *See Dolman*, 157 F.3d at 712; *Self-Realization Fellowship Church*, 206 F.3d at 1326. Nor are we alone in applying the work-for-hire doctrine to a case in which an employer commissioned a work by an independent contractor. *See Estate of Burne Hogarth*, 342 F.3d at 163 (there is no "distinction in the case law under the

1909 Act between employees and independent contractors"); *Playboy*, 53 F.3d at 554; *see also Murray v. Gelderman*, 566 F.2d 1307, 1311 n.7 (5th Cir. 1978) (observing that the work-for-hire doctrine is applicable when the parties are an employer and an independent contractor); *Forward v. Thorogood*, 985 F.2d 604, 606 (1st Cir. 1993) (noting that, although previously confined to the traditional employer-employee relationship, the work-for-hire doctrine has been expanded to include commissioned works created by an independent contractor).

To the extent that Dastar argues that the Supreme Court's 1989 decision in *CCNV* undermines our existing precedent, we are unpersuaded. First, as a preliminary matter, we considered two cases post-*CCNV*, both of which reaffirmed our law that works created by independent contractors at the instance and expense of a commissioning party are presumed to be works-for-hire. *See Self-Realization Fellowship Church*, 206 F.3d at 1326; *Dolman*, 157 F.3d at 712.

Second, the *CCNV* Court considered the meaning of "work-for-hire" only under the 1976 Copyright Act. 490 U.S. at 732. In recounting the history of the work-for-hire doctrine, the Supreme Court noted that under the 1909 Act, "the courts generally presumed that the commissioned party had impliedly agreed to *convey* the copyright, along with the work itself, to the hiring party." *Id.* at 744 (emphasis added). Dastar argues, based on this statement, that if the commissioning party acquires the copyrights from the independent contractor through an implied agreement to convey, then the work was not made for hire because, with works-for-hire, the commissioning party *automatically* owns the copyright upon creation in the first place — there is no need to convey any rights. *See* 1909 Act, 17 U.S.C. § 26 (repealed 1976) (" 'author' shall include the employer in the case of works made for hire").

**[4]** We join the Second Circuit in rejecting that argument. *See Estate of Burne Hogarth*, 342 F.3d at 162-63. The *CCNV*

Court was clear that it was considering the meaning of the work-for-hire provision of the 1976 Copyright Act. 490 U.S. at 732. No part of its decision rests on the meaning of the work-for-hire provision in the 1909 Act, rendering its commentary non-binding dicta. *See Estate of Burne Hogarth*, 342 F.3d at 163 ("[W]e conclude that the historical review in *CCNV*, if dictum at all, is dictum of a weak variety . . . ." ); *see also Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1173 (9th Cir. 2004) ("A statement is dictum when it is made during the course of delivering a judicial opinion, but is unnecessary to the decision of the case and is therefore not precedential.") (internal citation, alterations, and quotation marks omitted).[2] To the extent necessary, we reaffirm the well-established law of this circuit: an independent contractor creates a work-for-hire when it was made at the instance and expense of the commissioning party. *Lin-Brook*, 352 F.3d at 300.

### III

Having concluded that independent contractors may as a matter of law create works-for-hire, we consider whether in this case, as determined by the district judge in her capacity as the trier of fact, General Eisenhower wrote *Crusade in Europe* at the instance and expense of Doubleday. *May*, 618 F.2d at 1368 n.4. We review the district court's conclusions of law following a bench trial *de novo*. *Friends of Yosemite Valley v. Norton*, 348 F.3d 789, 793 (9th Cir. 2003). Factual conclusions, however, are reviewed for clear error. *Id.*

To the extent that Dastar challenges the district court's findings of fact, we find no clear error and affirm them. *See*

---

[2]We further note that *CCNV* only opined as to what "courts *generally* presumed," *CCNV*, 490 U.S. at 744 (emphasis added), citing only to dated Second Circuit cases, and omitting any discussion of or citation to our own well-established precedent. As we explained, in the final ten years that it was effective, the 1909 Act work-for-hire doctrine expanded to include independent contractors.

*id.* at 793. The determinations of the district court must be upheld unless on review of all the evidence we are left with the "definite and firm conviction that a mistake has been committed." *Easley v. Cromartie*, 532 U.S. 234, 242 (2001). "[I]t is for the district court to resolve the factual disputes and to draw inferences from that proof." *Husain v. Olympic Airways*, 316 F.3d 829, 835 (9th Cir. 2002). Though our colleague in dissent would reach different factual conclusions from the evidence adduced at trial, we may not disturb the district court's factual findings where we would have drawn different inferences or determined the facts differently. *Easley*, 532 U.S. at 242. Thus, although we may agree with the dissent that the evidence presented could have permitted different inferences than the district court ultimately drew, we find no clear error in the district court findings of fact and adopt them in full for the purposes of our analysis.

## A

**[5]** We recently described the "instance" test as an inquiry into whether "the motivating factor in producing the work was the employer who induced the creation." *Self-Realization Fellowship Church*, 206 F.3d at 1326 (quoting *Playboy*, 53 F.3d at 554). The "instance" test is shaped in part by the degree to which the "hiring party had 'the right to control or supervise the artist's work.' " *Self-Realization Fellowship Church*, 206 F.3d at 1327 (citing MELVILLE B. NIMMER AND DAVID NIMMER, *Nimmer on Copyright*, § 5.03[B][1][a][I] (1999)).

**[6]** General Eisenhower's case presents the prototypical situation where the motivating factor for producing the work was the employer's inducement. General Eisenhower spurned all book offers until approached by representatives from Doubleday and *Tribune* who convinced him to pen his personal account of the war. Moreover, he did not begin the actual writing until after December 30, 1947. *Cf. Siegel v. Nat'l Periodical Publ'ns, Inc.*, 508 F.2d 909, 914 (2d Cir. 1974).

Where, as here, a reluctant author who historically had refused to engage in the creative process begins to write voraciously after being persuaded by a publisher, the evidence is sufficient to support the factual conclusion that the work was at the publisher's "instance." *See Playboy*, 53 F.3d at 556 (author's work was created at the instance of the publisher where the author "would not have created those particular [works] if he had not been given the assignments" by the publisher).

This case stands in stark contrast to our decision in *Self-Realization Fellowship Church*. In that instance, we held that works created by a monk who had taken a vow of poverty, assigned all his possessions to the church he founded, and renounced any claim he may have for compensation, were not works-for-hire under the 1909 Act. 206 F.3d at 1327. We concluded that because the works were "motivated by [the monk's] own desire for self-expression" they were not works-for-hire. *Id.* at 1326-27; *see also Forward*, 985 F.2d at 606 (holding that demo tapes prepared by the artist for the purposes of enticing a record company to produce and distribute them were not created at the instance of the employer); *Siegel*, 508 F.2d at 914 (holding that the Superman comic strip was not created at the employer's instance where the Superman character "had been spawned by the [author] four years before the relationship between [the] authors and the [employer]"); *cf. Picture Music, Inc. v. Bourne, Inc.*, 457 F.2d 1213, 1217 (2d Cir. 1972) (holding a work is deemed for hire where the employer took the "initiative in engaging" the author to create the work).

**[7]** Dastar argues that the book could not have been created at Doubleday's instance because General Eisenhower had been drafting notes and small portions of what he thought might ultimately coalesce into a full book prior to any agreement with Doubleday to publish. The district court rejected that assertion as a matter of fact, finding that what General Eisenhower himself described as attempts "to draft a bit of

narrative just to satisfy myself that I had something to say that was worth hearing," were nothing more than an "experiment" done "more as a protection to [him]self in the event [he] ever did want to write." Moreover, although General Eisenhower used notes made throughout the war "to jog and reinforce his memory," he otherwise wrote from scratch. Critically, Dastar did not introduce any evidence suggesting that General Eisenhower had begun drafting the book before he reached his agreement with Doubleday in December 1947.[3] In sum, we think the factual record is more than sufficient to conclude that General Eisenhower's creation of *Crusade in Europe* was induced by Doubleday.

[8] Additionally, we are satisfied by the evidence that Doubleday had sufficient supervisory powers over General Eisenhower's authorship, a point which Dastar does not contest. We note that complete control over the author's work is not necessary. *See Picture Music*, 457 F.2d at 1217 (holding that supervision existed where the commissioning party had "the power to accept, reject, or modify [the] work"). Instead, the issue is one of degree where the greater the degree of supervisory power and control a commissioning party has over an independent contractor, the more likely it is that the work was created at the commissioning party's instance.

[9] Doubleday had a significant degree of supervision over General Eisenhower's writing. Specifically, the district court determined that Doubleday's typical process for most books involved waiting for the manuscript to be completed, and then discussing possible improvements with the author. With *Cru-*

---

[3]Dastar argues that a 1948 magazine article reporting that General Eisenhower wrote the first 60,000 words of *Crusade in Europe* in 1942 while stationed in Gibraltar would have demonstrated that General Eisenhower began writing his war memoirs not at Doubleday's insistence, but of his own volition. However, this article was excluded by the district court as hearsay. We see no abuse of discretion in the district court's exclusion of that inadmissible evidence, and we do not consider it on appeal.

*sade in Europe*, however, the degree of in-person supervision was much greater than usual, including regular face-to-face meetings between General Eisenhower and Doubleday during the writing process where its editorial board provided him with extensive notes and comments. Doubleday also hired a fact checker who "offered suggestions for modifications and additions . . . where the original draft did not conform with historical facts." The district court did not clearly err in deciding that this evidence supported a conclusion that General Eisenhower would not have written the work without the urging of Doubleday and *Tribune*.

B

**[10]** Moreover, there is little doubt that the book was authored at Doubleday's expense. Doubleday took on all the financial risk of the book's success, agreeing to pay General Eisenhower a lump sum for writing the book, instead of negotiating a royalty deal. In addition, Doubleday shouldered the expense for the entire staff who assisted General Eisenhower in drafting the manuscript, including three secretaries, a fact checker, and the services of the editorial board at Doubleday. Finally, Doubleday took responsibility for all the costs necessary to produce the maps and photographs that were included in the book. There was no evidence that General Eisenhower paid for a single expense associated with writing and publishing the book.

**[11]** We thus uphold the district court's conclusion that, because General Eisenhower would not have authored or published *Crusade in Europe* without Doubleday's convincing, and because there is no question that Doubleday carried the financial load of preparing the book, it was in fact created at the instance and expense of the commissioning party.

IV

**[12]** Where we determine that a work was produced at the instance and expense of another party, we indulge the legal

presumption that it is a work-for-hire — that the copyright lies *ab initio* with the commissioning party. *See Dolman*, 157 F.3d at 711-12; *Self-Realization Fellowship Church*, 206 F.3d at 1326. "The work for hire presumption can be overcome by evidence of an agreement by which the employee or independent contractor retained the copyright in his work." *Dolman*, 157 F.3d at 712.

Dastar argues that the October 1, 1948, contract purporting to assign all rights in *Crusade in Europe* to Doubleday is inimical with the work-for-hire doctrine. Had Doubleday acquired the copyrights under the work-for-hire doctrine, there would be no need for a later assignment of those very rights. Thus, according to Dastar, the 1948 conveyance proves that the parties never intended the work-for-hire presumption to apply.

**[13]** The presumption may be rebutted only by evidence that the parties did not intend to create a work-for-hire. *See id.* at 712-13; *Lin-Brook*, 352 F.2d at 300 (holding that the evidence was insufficient to rebut the presumption because there was no evidence "as to the circumstances or intendment" of the parties). And thus, the contract alone, however, is insufficient to rebut the presumption. *Lin-Brook*, 352 F.2d at 300. In *Lin-Brook*, we faced a similar situation where just before the commencement of the lawsuit, the independent contractor/author executed an assignment to the commissioning party of the copyrights in allegedly infringed drawings. 352 F.2d at 300. We rejected the district court's determination that the assignment demonstrated prior lack of title in the commissioning party because "without any evidence as to the *circumstances or intendment* of its execution" the agreement was insufficient to rebut the presumption. *Id.* (emphasis added).

**[14]** The only rebuttal evidence of intent to which Dastar points is the IRS tax treatment of the book. We are, however, unconvinced that the tax treatment of a publishing deal bears on whether Doubleday and General Eisenhower intended the

work to be a work-for-hire. Doubleday and General Eisen-
hower's 1947 agreement to publish the book evidenced their
intent to create a work-for-hire. As General Eisenhower
stated:

> I'm ready to undertake this task but on one condition
> only: it seems to me that every time the subject is
> brought up, people talk about all the various kinds of
> publishing rights and so on and I don't want to be
> bothered with such things. Now if you people can
> come up with a single package to cover the whole
> affair so that I don't have to argue with too many
> people, I will probably undertake something.

Thus, the record supports the district court's conclusion that
General Eisenhower and Doubleday contemplated a work-for-
hire scenario where General Eisenhower need never be con-
cerned with the rights to the book. As the district court deter-
mined, the only reason that the parties did not execute a
formal agreement purporting to create a work-for-hire in 1947
was to comply with the formalistic tax requirements set out by
the IRS. Doubleday, in particular, was sensitive about not cre-
ating any formal written instrument that could potentially
jeopardize capital gains treatment of the Eisenhower deal —
a strange concern had it been worried that delay in reducing
the agreement to writing could have had a negative impact on
its ownership of the copyright.

**[15]** Moreover, there is no evidence in the record that either
General Eisenhower or Doubleday thought that Doubleday
did not own the copyright. Nor is there evidence that General
Eisenhower thought that he had to legally transfer such title
for Doubleday to acquire title to the copyright. Finally, Dou-
bleday acted in a manner consistent with its status as the
copyright owner. When it renewed the copyright in 1975,
Doubleday listed itself as the proprietor of the copyright as a
work-for-hire. We agree with the district court that there is

insufficient evidence to rebut the presumption that *Crusade in Europe* was a work created for hire.[4]

V

Dastar next argues that Doubleday did not hire General Eisenhower until February 8, 1948, and Doubleday can only claim rights in material created after that date. We again disagree. The district court properly determined as a matter of fact that Doubleday and General Eisenhower entered into an agreement on December 30, 1947. We uphold its legal conclusion that the entire published contents of *Crusade in Europe* were properly copyrighted.

[16] Moreover, the district court determined that Dastar admitted to copying without authorization substantial portions of *Crusade in Europe* to create *Campaigns in Europe*. Dastar has presented no arguments that give us cause to reverse the district court's judgment. We affirm the district court's judgment of infringement.

VI

[17] Dastar also claims on appeal that the district court erred by restricting the scope of the trial on remand. We dis-

---

[4]*Dolman* does not compel a different result. In that case we held that the defendant had introduced sufficient evidence to rebut the work-for-hire presumption, relying in part on evidence that the author, Shield, assigned away the copyrights to the subject works. 157 F.3d at 713. We concluded that the presumption had been successfully rebutted by relying specifically on evidence in addition to the assignment, including evidence that the assignee filed copyright registrations and renewals naming Shield as the author. *Id.* Here, however, Doubleday initially registered itself as the copyright owner and indicated on the 1975 copyright renewal that it was the proprietor as a work-for-hire. The evidence in *Dolman*, unlike here, went to the parties' intent regarding the issue of copyright ownership. *Id.* Dastar's reliance on the attempt to obtain favorable tax treatment does nothing to undermine the presumption that the parties intended to create a work-for-hire.

agree. We vacated the district court's initial grant of summary judgment on Twentieth Century Fox Parties' copyright infringement claim because "the evidence raise[d] doubt as to Eisenhower's intent with respect to *Crusade in Europe.*" *Twentieth Century Fox Film Corp. v. Entm't Distrib.*, 34 Fed. Appx. 312, 314 (9th Cir. 2002) (unpublished). There is nothing in our prior decision that indicates that we issued an open remand. Rather, in remanding to the district court, our opinion contemplates a trial to resolve the only remaining genuine issue of material fact: General Eisenhower's intent to create a work-for-hire. *See also Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 28 n.2 (2003) (stating that the "Ninth Circuit held that the tax treatment General Eisenhower sought for his manuscript of the book created a triable issue as to whether he intended the book to be a work for hire"). The district court properly conducted the trial we ordered.

## VII

### A

**[18]** We now consider the district court's award of attorneys' fees under 17 U.S.C. § 505.[5] Under § 505, the district court has discretion to award "reasonable attorney[s'] fee[s] to the prevailing party." 17 U.S.C. § 505. "[A]n award of attorney[s'] fees to a prevailing [party] that furthers the under-

---

[5]Although the 1909 Act clearly applies to the substantive nature of the protection, Twentieth Century Fox Parties successfully moved for attorneys' fees under § 505 of the 1976 Act. We note that this is not the first instance where a party sought relief for infringement under the 1909 Act, but pursued its attorneys' fees claim under the 1976 Act. *See Magnuson v. Video Yesteryear*, 85 F.3d 1424 (9th Cir. 1996). And although both acts have substantially similar provisions for awarding attorneys' fees, *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 523-24 (1994), we do not consider whether the attorneys' fee award should be analyzed under the 1909 Act or under the 1976 Act because neither party raised that issue on appeal. We simply accept the parties' contention that the district court's award of fees under § 505 should be reviewed for an abuse of discretion.

lying purposes of the Copyright Act is reposed in the sound discretion of the district courts . . . ." *Fantasy, Inc. v. Fogerty*, 94 F.3d 553, 555 (9th Cir. 1996). In awarding fees, the district court may consider the following factors: (1) frivolousness; (2) motivation; (3) objective unreasonableness both in the factual and legal components of the case; (4) and the need in particular circumstances to advance the dual goals of compensation and deterrence. *Fogerty v. Fantasy, Inc.*, 510 U.S. at 534 n.19.

**[19]** "A district court's fee award does not constitute an abuse of discretion unless it is based on an inaccurate view of the law or a clearly erroneous finding of fact." *Fantasy*, 94 F.3d at 556 (quoting *Schwarz v. Sec'y of Health & Human Servs.*, 73 F.3d 895, 900 (9th Cir. 1995)). "Generally, a district court's order on attorney[s'] fees may be set aside if the court fails to state reasons for its decision . . . ." *Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 815 (9th Cir. 2003). Remand is required only where the record does not support the district court's fee award. *Id.*

**[20]** Nothing in the record, and none of Dastar's arguments, convince us that the district court abused its discretion in awarding fees based on the copyright claims. The mere fact that it relied on its earlier findings to support its fee award does not equate with a failure to articulate reasons for an award. Quite the contrary, as all the parties agree, the district court incorporated its earlier findings into its December 2004 fee award, thereby providing us with a sufficient basis to determine that it considered the factors listed in *Fogerty v. Fantasy, Inc*. *See Magnuson v. Video Yesteryear*, 85 F.3d at 1432.

Similarly, we reject Dastar's claim that the district court improperly granted fees to Twentieth Century Fox Parties for defending against Dastar's unfair competition and slander claims. Fee awards may include costs and fees associated with defending against counterclaims if the counterclaims "involve

a common core of facts or are based on related legal theories." *Webb v. Sloan*, 330 F.3d 1158, 1168 (9th Cir. 2003) (emphasis omitted). Dastar's counterclaims are predicated on its assertion that Doubleday did not own the copyright to *Crusade in Europe*, and are thus sufficiently related.

Finally, Dastar argues that the district court improperly awarded fees generated by Twentieth Century Fox Parties in defending against Dastar's prior appeal of the district court's summary judgment award. Relying heavily on Circuit Rules 39-1.6 and 39-1.8, Dastar contends that the district court was without jurisdiction to award appeal fees, primarily because Twentieth Century Fox Parties did not first file an application with us to recover fees and expenses.

In *Cabrales v. Los Angeles*, 935 F.2d 1050 (9th Cir. 1991), we held that a party requesting fees under 42 U.S.C. § 1988, a fee and cost provision similar in form to § 505, *see* 17 U.S.C. § 505, was improperly denied fees for an intermediate appellate stage of its litigation where it was unsuccessful, although it was ultimately successful on the merits of its claims. In that case, the plaintiff secured a judgment from the district court that was affirmed on appeal. *Id.* at 1051. The Supreme Court vacated our decision, however, and remanded for reconsideration. *Id.* We affirmed our prior holding and reinstated the district court's judgment. *Id.* After the Supreme Court denied the defendant's second petition for certiorari, the plaintiff moved in the Supreme Court for its attorneys' fees. *Id.* The Supreme Court then remanded to the district court which awarded her attorneys' fees for work done on the second petition, but not the first. *Id.* We reversed, holding that "plaintiffs are to be compensated for attorney[s'] fees incurred for services that contribute to the ultimate victory in the lawsuit." *Id.* at 1052; *see also NAACP v. Richmond*, 743 F.2d 1346, 1358-1359 (9th Cir. 1984) (remanding to the district court to award attorneys' fees for services at the trial and appellate level to the Appellant, who ultimately prevailed).

**[21]** We think the same rationale is applicable here. "Rare, indeed, is the litigant who doesn't lose some skirmishes on the way to winning the war. Lawsuits usually involve many reasonable disputed issues and a lawyer who takes on only those battles he is certain of winning is probably not serving his client vigorously enough . . . ." *Cabrales*, 935 F.2d at 1053. We see no abuse of discretion in the district court's decision to award Twentieth Century Fox Parties its fees for the prior summary judgment appeal.

### B

**[22]** Dastar further argues that the district court erred in awarding non-taxable costs under § 505 because only costs specified as taxable costs in 28 U.S.C. § 1920 can be included in an attorneys' fee award. On this final point we again disagree with Dastar. Section 505 provides that "the court in its discretion may allow the recovery of full costs by or against any party . . . ." 17 U.S.C. § 505. Section 1920, however, limits the costs taxable against the losing party, enumerating five categories of costs that may be awarded. 28 U.S.C. § 1920.

In *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 445 (1987), the Supreme Court considered the power of the federal courts to require a losing party to pay the compensation of the winning party's expert witness. Holding that costs taxable under Fed. R. Civ. P. 54(d) are limited to those set forth in 28 U.S.C. §§ 1920 and 1821, the Supreme Court explained that "[a]ny argument that a federal court is empowered to exceed the limitations explicitly set out in §§ 1920 and 1821 without plain evidence of congressional intent to supersede those sections ignores our longstanding practice of construing statutes *in pari materia*." *Crawford Fitting*, 482 U.S. at 445.

While we have not considered the question, our brethren who have addressed the issue are split. In *Pinkham v. Camex, Inc.*, 84 F.3d 292 (8th Cir. 1996), for example, the Eighth Cir-

cuit concluded that § 505 did not clearly evidence congressional intent that it exceeded the scope of costs authorized by § 1920. *Id.* at 295; *see also Artisan Contractors Ass'n, of Am., Inc. v. Frontier Ins. Co.*, 275 F.3d 1038, 1039-40 (11th Cir. 2001). On the other hand, the Seventh Circuit has suggested that non-taxable costs, outside the gambit of those available under § 1920, may be awarded under § 505. *Susan Wakeen Doll Co. v. Ashton Drake Galleries*, 272 F.3d 441, 458 (7th Cir. 2001) ("[A]ny award of fees and non-taxable costs must come through [§ 505], and not through the general cost provisions of 28 U.S.C. § 1920."); *see also Invessys, Inc. v. McGraw-Hill Cos., Ltd.*, 369 F.3d 16, 22 (1st Cir. 2003) (holding that costs of electronic legal research, costs not enumerated as taxable under § 1920, are nevertheless reimbursable under § 505); *Coles v. Wonder*, 283 F.3d 798, 803 (6th Cir. 2002) (affirming award of non-taxable costs under § 505 without discussion).

**[23]** *Crawford Fitting* instructs us to carefully inspect § 505 for clear evidence of congressional intent that non-taxable costs should be available. We respectfully disagree with those circuits who have concluded differently, but we think that there can be no other import to the phrase "full costs" within § 505. Construing § 505 as limiting the costs that may be awarded to any particular subset of taxable costs effectively reads the word "full" out of the statute. We must give every word in a statute meaning. To do otherwise would be to violate the long standing principle of statute interpretation that "statutes should not be construed to make surplusage of any provision." *Northwest Forest Res. Council v. Glickman*, 82 F.3d 825, 834 (9th Cir. 1996) (internal alteration omitted). Thus, we hold that district courts may award otherwise non-taxable costs, including those that lie outside the scope of § 1920, under § 505.

AFFIRMED.

D.W. NELSON, Circuit Judge, dissenting:

I respectfully dissent from the opinion of my colleagues. I do not agree that Eisenhower and Doubleday intended *Crusade in Europe* to be a "work-for-hire" under the 1909 Copyright Act. Given the state of copyright law at the time that Eisenhower and Doubleday entered their agreement, I do not believe the parties intended that the work be "for hire" as that term was then understood. Furthermore, the contract between Eisenhower and Doubleday, the tax treatment that Eisenhower received for the manuscript, and the evidence in the record that several publishers were offered the opportunity to compete for the right to publish Eisenhower's manuscript point to one conclusion only: that Eisenhower sold Doubleday a *product*, not his *services*. Thus, I conclude that *Crusade in Europe* was not written as a work for hire, and accordingly would reverse the district court judgment in favor of Doubleday.

As the majority explains, the 1909 Copyright Act does not contain a definition for the term "work-for-hire." *See* Majority Op. at 15377. The majority describes how courts have developed the doctrine establishing the meaning of the term, and how that doctrine has evolved to encompass a broader range of employment relationships. *Id.* at 15377. As the majority acknowledges, this court-made doctrine initially held that only works created by traditional "employees" fell under the "work for hire" doctrine. *Id.*; *see also Cmty for Creative Non-Violence v. Reid*, 490 U.S. 730, 749 (1989) ("*CCNV*"), *Self-Realization Fellowship Church v. Ananda Church of Self-Realization*, 296 F.3d 1322, 1327 (9th Cir. 2000). It was not until the 1960s that this Circuit for the first time included work created by independent contractors in the scope of the "work for hire" doctrine. *CCNV*, 490 U.S. at 749; *Lin-Brook Builders Hardware v. Gerstler*, 352 F.2d 298, 300 (9th Cir. 1965). The presumption that a given work is "for hire" is simply that — a presumption, "based on the presumed mutual intent of the parties." *May v. Morganelli-Heumann & Assocs.*, 618 F.2d 1363, 1368 (9th Cir. 1980). I conclude that as the

law stood in 1948, it is unlikely that either party to the transaction viewed the sale of *Crusade in Europe* to Doubleday as the creation of a work for hire. No one has suggested that in 1948, when Eisenhower entered his deal with Doubleday, he was in a traditional employment relationship with Doubleday. Yet the law governing "work for hire" in 1948 extended only to such relationships. Thus, I fail to see how the majority can conclude that the parties intended the work to be "for hire" when that doctrine was understood to encompass only works created by employees.

Furthermore, in making its factual findings, the district court relied heavily on documents and testimony addressing Eisenhower's and Doubleday's hindsight reconstruction of the events, to the exclusion of other evidence in the record that cast the events in a different light. For instance, the record contains evidence that Eisenhower had been seeking a publisher prior to his meeting with Doubleday, such as notes by Robinson (of the *Tribune*), indicating that Eisenhower was looking for a publisher (as opposed to Doubleday looking for an author), as well as evidence that other publishers were offering to buy Eisenhower's manuscript. The record also contains evidence in the form of correspondence with Dick Simon of Simon & Schuster that reveals that Eisenhower had made initial attempts to write his memoirs over a year before his meeting with Robinson. The record shows that in 1947, Eisenhower wrote to his wife in order to convey his papers in the event of his death, revealing that Eisenhower had long contemplated that his writings could be lucrative and take care of his family's financial needs. It is hardly as clear that "Eisenhower would not have written the work without the urging of Doubleday and *Tribune*," as the majority appears to indicate. Majority opinion at 15384.

The majority simply defers to the district court's interpretation of the facts. But the district court selectively relied on after-the-fact recollections and the testimony of a witness who was not even employed at Doubleday during the negotiations

with Eisenhower. In my opinion, this reliance resulted in a lopsided view of the facts that is overly influenced by the way the parties viewed the events many years down the road, once the significance of the events was clear in the parties' minds. I cannot arrive at the majority's conclusion about the parties' intentions without disregarding significant evidence in the record, and I have no reason to assume that the evidence that has been disregarded is any less reliable than the evidence that the district court relied upon.

The majority concludes that neither the contract for the sale of *Crusade in Europe* nor the tax treatment of the income that Eisenhower received rebuts the presumption that the parties intended to create a work for hire. Majority Opinion at 15384-87. Here, again I must part ways with my colleagues. I cannot read the contract for the manuscript's sale without concluding that it clearly provided for the sale of publication rights, an action that is completely at odds with the idea that the book had been created "for hire."

The contract states: "I hereby sell, assign, transfer and set over unto Doubleday . . . for its own use, absolutely and forever, the manuscript of my War Memoir entitled CRUSADE IN EUROPE, and all rights of every nature pertaining thereto." The explicit terms of the contract reveal that Eisenhower had the right, at the time of the transaction, to sell his copyright interest in the work to Doubleday. The contract thus reflects a transfer of Eisenhower's common law copyright interest to Doubleday. *See, e.g.*, *Urantia Found'n v. Maaherra*, 114 F.3d 955, 960 (9th Cir. 1997) ("Under the 1909 Copyright Act, an unpublished work was protected by common law copyright from the moment it was created . . .") (citation omitted). However, if *Crusade in Europe* were a work for hire, the copyright would have vested in Doubleday from the moment it was created. *See, e.g.*, *Dolman*, 157 F.3d at 713. In *Dolman*, we considered the copyright to songs created by Roy Shield, who was an employee of Victor Talking Machine. 157 F.3d at 710. The composer assigned his copy-

right in the songs to Southern Music Publishing Company, the publishing arm of Victor. *Id.* We concluded that the assignment of the copyright rebutted the presumption that the employee's work was for hire. "Had the works been intended to be works for hire for Victor, there would have been no reason for Southern to accept an invalid assignment of rights from Shield, knowing that its parent company already owned those rights." *Id.* at 713. This sentiment is equally relevant here — why would Eisenhower transfer his copyright to Doubleday if it was already in Doubleday's name by virtue of its status as being created at Doubleday's "instance and expense"?[1] If the oral agreement of the parties was intended to transfer ownership of the manuscript to the Doubleday prior to its completion, the signed agreement would have no purpose. Eisenhower would have had nothing to convey to Doubleday: he would have conveyed the rights to the manuscript by virtue of its creation as a "work for hire." I conclude that the contract on its face rebuts the presumption that the parties intended the work to be for hire.

Similarly, I am not persuaded by the majority's analysis of the tax treatment of the proceeds of the sale of *Crusade in Europe.* In my opinion, the tax treatment that Eisenhower obtained rebuts the presumption that he was "hired" to write a book. Although tax law does not dictate the copyright status of a work, it reveals how the parties themselves viewed their employment arrangement. In this case, the income was treated as if it were derived from the sale of an asset, not from personal income. Clearly, Eisenhower was not paid by Doubleday for his writing services; he was paid by Doubleday for the end product.

---

[1]The majority attempts to distinguish *Dolman* by pointing out that in that case, the assignee of the copyrights named the composer as the author in copyright registrations. Majority opinion at 15387, n.4. I fail to see how that fact is relevant, and note that in this case, Doubleday specified that Eisenhower was the author of the work on its initial copyright registration. Doubleday did not indicate that the work was "for hire" until it filed a copyright renewal in 1975.

I cannot look at the record in this case without concluding that these facts are far from "the prototypical situation where the motivating factor for producing the work was the employer's inducement." Majority Op. at 15381. In my mind, it is clear that Eisenhower wanted to write *Crusade in Europe*, and would have done so under the auspices of the publisher who arranged things most favorably to him. By calling *Crusade in Europe* a "work for hire," the majority establishes a standard by which nearly any work produced with the financial and logistical support of a publisher could be considered to have been produced "for hire." I do not think that such an expansive conception of the term was intended by the drafters of the 1909 Copyright Act. Therefore, I must dissent.